Travis HENDRIX, Appellant,

v.

PORT TERMINAL RAILROAD ASSOCIATION, Appellee.

No. 01–05–00217–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 13, 2006.

Rehearing Overruled May 18, 2006.

---

6. The trial court also awarded attorney's fees to the Commission, which Neely does not contest.

George Payne, Tom R. Letbetter, Garrett, Letbetter & Payne, Houston, TX, for Appellant.

George Caflisch, Gordon A. Holloway, Kyle M. Rowley, Holloway & Rowley, P.C., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices JENNINGS and ALCALA.

1. 45 U.S.C. § 51 (2000).

## OPINION

TERRY JENNINGS, Justice.

Appellant, Travis Hendrix, challenges the trial court's rendition of summary judgment in favor of appellee, the Port Terminal Railroad Association ("PTRA"), in Hendrix's personal injury suit brought under the Federal Employers Liability Act ("FELA").[1] In his first issue, Hendrix, a railroad switchman, contends that the trial court erred in granting summary judgment on his claims for his personal injuries that he sustained while walking on an "unsafe walkway made up of too large and mixed ballast" on the grounds that such claims are preempted by the Federal Railroad Safety Act ("FRSA").[2] In his second issue, Hendrix contends that the trial court erred in granting summary judgment as to his "causes of action and theories of recovery" not addressed in the PTRA's summary judgment motion.

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

### Factual and Procedural Background

In his original petition, Hendrix alleged that he was injured while working as a switchman for the PTRA, that the PTRA's negligence caused him injuries, and that the PTRA negligently: "(1) failed to furnish a reasonably safe walkway on which to work; (2) furnished big rock ballast in the yard walkways; (3) expected and encouraged switchmen to regularly get on and off moving cars on big rock ballast in yard walkways; (4) expected and encouraged switchmen to regularly throw hard to throw switches on big rock ballast in yard walkways; (5) expected and encouraged switchmen to regularly hold up defective pin lift levers on big rock yard ballast; (6)

2. 49 U.S.C. § 20101 (2000).

expected and encouraged switchmen to regularly adjust hard to align draw bars on big rock yard ballast; (7) failed to furnish a safe place to work; and (8) failed to furnish safe equipment with which to work."

The PTRA filed a summary judgment motion, contending that Hendrix's "FELA allegations of improper ballast are preempted by the [FRSA]." The PTRA asserted that "the Federal Railroad Administration ('FRA'), under the authority of the FRSA, has promulgated regulations specifically addressing ballast" and that, "since the FRSA has specifically regulated track safety and track standards, including ballast, its regulations have occupied the subject matter of Hendrix's allegations," and, thus, Hendrix's FELA claims are preempted. In the closing of its motion, the PTRA reiterated its specific contention that Hendrix's "ballast claims concerning the nature and size of the ballast" are preempted and that, since this allegation "is the sole basis of Hendrix's suit," the PTRA was entitled to summary judgment on Hendrix's suit.

The PTRA attached a copy of a signed statement made by Hendrix in an incident report in which Hendrix stated that he was walking between tracks 40 and 41 of the rail yard for the purpose of "coupling cars," that he "did not notice any obstructions or uneven ballast which [he] was walking on," and that as he "continued walking northward between the two tracks" at "approximately half way down into the track [he] felt a sharp pain in [his] left ankle." Hendrix further stated that he did not "trip over anything in the toe path" and "did not notice anything unusual other than there was large ballast rocks as well as small fine walkway material along the tow path." The PTRA also attached a copy of Hendrix's deposition, in which Hendrix testified that he "stepped on some

big rocks and they kind of shifted underneath [his] feet and [his] ankle gave way" and that he felt a sharp pain in his ankle. Hendrix further testified, somewhat in contradiction to his statement, that the presence of large ballast in the rail yards was not unusual, that the large ballast was "everywhere" in the yard, and that there was no small fine walkway material.

Hendrix filed a response to the PTRA's summary judgment motion, asserting that his claims are not "preempted." Hendrix argued that while certain federal regulations prescribed minimum safety requirements for ballast, such requirements related only to "track structure and drainage" and did not relate to the size of ballast or the safety of walkway conditions. Hendrix attached to his response a copy of the deposition testimony of Edward Blysard, another PTRA switchman, who testified that he had made complaints to PTRA officials about the size of the ballast in the area of tracks 40 and 41 prior to Hendrix being injured. Blysard also stated that, in his opinion, the rocks between tracks 40 and 41 were unsafe, dangerous, created a walking hazard, and should have been removed. Hendrix also attached to his response the deposition testimony of Charles Anderson, a PTRA engineer, who testified that he had heard complaints about the size of the ballast in the walkways and that, in response to these complaints, the PTRA had brought in some smaller ballast to "smooth things out."

Finally, Hendrix attached to his response the deposition testimony of Darrell Himel, a PTRA supervisor with "responsibility for the track, the roadbed, the ballast, and the infrastructure," who testified that he had frequently visited the yard in response to complaints made by PTRA employees concerning the walkway conditions. Employees had complained that the ballast was too big and was inconsistent,

that the walkways were not level, and that the ballast would shift under their feet. Himel conceded that the relevant federal regulations did not address the size, type, or make up of ballast, that the regulations did not provide ballast standards for providing safe, secure, and level footing, and that such issues were left to the railroads. Himel further stated that the PTRA tries to follow various standards or recommendations concerning the size and type of ballast used in a rail yard. For example, the PTRA consults a manual published by the American Railway Engineering Association, which includes a section on ballast, and tries to follow the standards set forth therein, not only for track drainage and structural issues but also for safety.

After the PTRA filed its summary judgment motion, Hendrix filed a third amended petition, and ultimately a fourth amended petition. In his third amended petition, Hendrix repeated his initial allegations and made more specific allegations concerning the PTRA's alleged negligence in regard to the size of the ballast in the rail yard walkway. Specifically, Hendrix asserted that the PTRA "placed too big a rock ballast in the yard walkways," mixed small rock ballast with larger rock ballast, failed to properly smooth over and properly pack down the ballast rocks after complaints were made, failed to properly maintain and inspect the yard walkways and repair and replace the big rocks in the yard walkways, and failed "to provide level yard walkway ballast conditions." Furthermore, Hendrix added allegations that the PTRA was negligent in pressuring switching crews to work faster, reducing crew sizes, overworking crew members, sending Hendrix back to work with a weak ankle, abandoning certain safety rules, failing to hire a sufficient number of switchmen, and

failing to provide Hendrix with the necessary equipment in order to perform his job. Hendrix also added an allegation that the PTRA's conduct caused him "repeated ongoing trauma." The PTRA did not file an amended summary judgment motion addressing any new claims or theories raised by Hendrix's third amended petition.[3]

The trial court granted the PTRA's summary judgment motion and stated in its order that the "judgment is final, disposes of all claims and all parties, and can be appealed."

## Standard of Review

To prevail on a summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. Tex.R. Civ. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). We may affirm a summary judgment only when the record shows that a movant has disproved at least one element of each of the plaintiff's claims or has established all of the elements of an affirmative defense as to each claim. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). We must accept as true evidence in favor of the nonmovant and indulge every reasonable inference and resolve all doubts in favor of the nonmovant. *Cathey*, 900 S.W.2d at 341.

When, as in this case, a defendant moves for summary judgment based partially on its own affirmative defense, the defendant has the burden of proving each element of its defense as a matter of law. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984) (affirmative defenses of fraud and estoppel); *see also Kiefer v. Continental Airlines, Inc.*, 882 S.W.2d

**3.** The parties agree that the third amended petition was timely filed and should have been considered by the trial court when granting the PTRA's summary judgment motion.

496, 498 (Tex.App.-Houston [1st Dist.] 1994), *aff'd*, 920 S.W.2d 274 (Tex.1996) (affirmative defense of preemption).

## Preclusion

In his first issue, Hendrix contends that his claims for personal injuries that he sustained while walking on an "unsafe walkway made up of too large and mixed ballast" are not preempted by the FRSA. Hendrix notes that the only federal regulations related to ballast specify that "the ballast must provide proper track support and alignment and proper drainage" and that there are no regulations concerning the size, type, or mixture of ballast used in various areas of the track, walkways, and work areas of switchmen. In sum, Hendrix asserts that the federal regulations concerning ballast "deal with the safety of the track, not the safety of employees working in and around tracks" and that he "was not injured because of a track structure that was not properly supported by ballast or because the ballast did not provide proper drainage," but rather because of unsafe walkway conditions and "bad footing." He further notes that he is not attempting to enforce a tort duty "in contradiction of the ballast provisions" of the federal regulations.

The PTRA contends that the FRA, under the authority of the FRSA, has promulgated regulations specifically addressing ballast and that those regulations "occupied the field with regard to the subject matter of the regulation and of rail safety, precluding other regulations, common law tort remedies, and specifically allegations in a FELA suit regarding the same subject matter." The PTRA contends that "to allow a FELA plaintiff to claim that the track roadbed and walkway must be of a certain character and quality beyond that required by the regulations would invalidate" the regulations promulgated under the FRSA. Citing *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 948 F.2d 179 (5th Cir.1991) ("*Mopac II*"), and *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 833 F.2d 570 (5th Cir.1987) ("*Mopac I*"), the PTRA further asserts that the United States Court of Appeals for the Fifth Circuit has previously held that similar claims concerning rail yard ballast and walkway conditions are preempted.

 FELA, which was enacted by Congress with the purpose of reducing injuries and deaths resulting from accidents on interstate railroads, is a broad remedial statute that is to be construed liberally in order to effectuate its purposes. *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994). FELA "provides the exclusive remedy for a railroad employee injured as a result of his employer's negligence." *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 442 (5th Cir.2001). FELA mandates that railroads operating in interstate commerce

shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (2000).

 FRSA's stated purpose "is to promote safety in every area of railroad operations." 49 U.S.C. § 20101 (2000). In enacting the FRSA, Congress authorized the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a)

(2000). Congress further declared that "[l]aws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106 (2000). To effectuate the purpose of national uniformity, the FRSA contains a preemption clause that states, in part:

A State may adopt or continue in force any law, rule, regulation, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

*Id.* "According to [this section], applicable federal regulations may preempt any state 'law, rule, regulation, order, or standard relating to railroad safety' " and "[l]egal duties imposed on railroads by the common law fall within the scope of these broad phrases." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993); *see also Fed. Ins. Co. v. Burlington N. & Santa Fe Ry.,* 270 F.Supp.2d 1183, 1187 (C.D.Cal.2003) ("State common law tort claims, such as negligence, fall within the scope of this pre-emption.").

▮ The Secretary of Transportation has promulgated regulations pursuant to its FRSA authority, including establishing maximum train speeds for certain classes of railroad tracks. *Lane,* 241 F.3d at 442. The Supreme Court has held that the FRSA, and the federal regulations promulgated thereunder, preempt state tort claims in two areas. *Easterwood,* 507 U.S. at 676, 113 S.Ct. at 1743–44; *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 358–59, 120 S.Ct. 1467, 1477, 146 L.Ed.2d 374 (2000). First, in *Easterwood,* the Supreme Court held that the FRSA preempted a state common law tort claim alleging that a train traveling at excessive speed caused the death of a truck driver. 507 U.S. at 676, 113 S.Ct. at 1743–44. After noting that, "on their face, the [relevant regulations] address only the maximum speeds at which trains are permitted to travel" the Court found that "related safety regulations ... reveal that the limits were adopted only after the hazards posed by track conditions were taken into account," and, thus, "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that [the plaintiff sought] to impose." *Id.* at 674, 113 S.Ct. at 1742. Thus, the Court concluded that the federal regulations preempted a state common law negligence claim alleging that the train was traveling at an excessive speed. *Id.* at 675–76, 113 S.Ct. at 1742–43. More recently, the Supreme Court has held that the FRSA, and the relevant regulations promulgated thereunder concerning warning devices at railroad crossings, preempt state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings when federal funds have been used in installing those devices. *Shanklin,* 529 U.S. at 358–59, 120 S.Ct. at 1477. In both of these cases, the Supreme Court made clear that the "language of the FRSA's preemption provision dictates that, to preempt state law, the federal regulation must 'cover' the same subject matter, and not merely 'touch upon' or 'relate to' that subject matter." *Id.* at 352, 120 S.Ct. at 1473. The Court has also noted that " 'covering' is a more restrictive term, which indicates that preemption will lie only if the federal regulations substantially subsume the subject matter of the

relevant state law." *Easterwood,* 507 U.S. at 664, 113 S.Ct. at 1738.

Because this case involves negligence allegations brought by an employee under FELA, rather than allegations brought by a private citizen under state common law tort remedies, we are not presented with a "preemption analysis" like that presented in *Easterwood* and *Shanklin.* Rather, we are presented "with the interaction of two federal statutes." *Waymire v. Norfolk & W. Ry. Co.,* 218 F.3d 773, 775 (7th Cir. 2000). Both the United States Court of Appeals for the Seventh Circuit, and, more recently, the United States Court of Appeals for the Fifth Circuit, have cited the "preemption" analysis in *Easterwood* and *Shanklin* in determining that certain FELA negligence claims are "precluded" by the FRSA. In *Waymire,* the Seventh Circuit extended the Supreme Court's holding in *Easterwood* and *Shanklin* to apply to a FELA negligence action alleging unsafe train speed and inadequate warning devices at railroad crossings. 218 F.3d at 775. In that case, a railroad employee brought a FELA claim against his employer and alleged that his employer was negligent in allowing a train to travel at an unsafe speed; the employee also alleged that the railroad used inadequate warning devices. *Id.* The *Waymire* court found that "in order to uphold FRSA's goal of uniformity [it] must strike the same result" reached in *Easterwood* and *Shanklin. Id.* at 776. Thus, it held that the FELA negligence claims based upon train speed and inadequate warning devices were superseded by the FRSA and the regulations promulgated thereunder. *Id.* at 777.

The Fifth Circuit followed suit in *Lane,* when a railroad employee brought an "excessive-speed" claim against his employer after the train on which he was working struck a tractor-trailer at a railroad cross-ing. 241 F.3d at 441–42. The employee argued that the FRSA did not preclude his FELA excessive-speed claim and further asserted that "the FRSA speed regulations are *minimum* safety requirements" and that compliance with the minimum requirements does not preclude finding negligence "if *reasonable* railroads would have taken additional precautions to prevent injury to their employees." *Id.* at 442. The Fifth Circuit rejected the employee's argument, noting that "uniformity can be achieved only if the regulations covering train speed are applied similarly to a FELA plaintiff's negligence claim." *Id.* at 443.

*Waymire* and *Lane* establish that, at least in some circumstances, a negligence claim brought under FELA may be precluded by the FRSA and the federal regulations promulgated thereunder. Thus, the underlying issue before us is whether the FRSA and regulations promulgated thereunder preclude Hendrix's FELA claims arising out of his allegations concerning unsafe walkway conditions and rail yard ballast.

The Secretary of Transportation has promulgated regulations pursuant to his FRSA authority related to ballast, which, in relevant part, provide:

PART 213 TRACK SAFETY STANDARDS

§ 213.1 Scope of Part

This part prescribes initial minimum safety requirements for railroad track that is part of the general railroad system of transportation. The requirements prescribed in this part apply to specific track conditions existing in isolation. Therefore, a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track.

. . . .

Subpart D–Track Structure

§ 213.101 Scope.

This subpart prescribes minimum requirements for ballast, crossties, track assembly fittings, and the physical conditions of rails.

§ 213.103 Ballast; general.

Unless it is otherwise structurally supported, all track shall be supported by material which will—

(a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;

(b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

(c) Provide adequate drainage for the track; and

(d) Maintain proper track cross-level, surface and alinement [sic].

49 C.F.R. §§ 213.1, 213.101, 213.103.

As noted by Hendrix, these regulations relate to track structure and drainage, and the size and type of ballast are not specifically covered in the regulations. In support of his contention that his ballast claims are not precluded, Hendrix cites to *Grimes v. Norfolk Southern Railway Co.,* 116 F.Supp.2d 995, 998 (N.D.Ind.2000); *CSX Transportation, Inc. v. Miller,* 159 Md.App. 123, 858 A.2d 1025, 1039 (2004); and *Elston v. Union Pacific,* 74 P.3d 478, 488 (Colo.Ct.App.2003). In *Grimes,* a railroad conductor sustained injuries when he fell into a hole while walking beside the tracks in order to inspect a train after a vehicular collision. 116 F.Supp.2d at 998. The conductor alleged that he was forced to walk on the edge of the ballast because the area directly adjacent to the track was too steep and because there were "large stones used in the ballast [that] rolled

under his feet." *Id.* The conductor claimed that the railroad was negligent in failing to provide a safe walkway for employees to use when they must walk alongside the train to inspect the cars. *Id.* at 1000. The railroad sought summary judgment on the ground that its compliance with the FRSA regulations dealing with track beds and ballast precluded the conductor's FELA claims. *Id.* at 1002. The court, noting that "the regulations are directed toward creating a safe roadbed for trains, not a safe walkway for railroad employees," did not find anything in the regulations that precluded the conductor from asserting that the railroad was negligent in failing to provide a safe place to walk. *Id.* at 1002–03. The court further noted, "There is also nothing in the language or legislative history of any enactment, including FRSA, that indicates the serious purpose of undermining the basic core of FELA and its essential purposes." *Id.* at 1003. In conclusion, the court "declined [the railroad's] invitation" to "preclude a negligence claim under FELA for any conduct by the railroad even remotely covered by a regulation enacted under FRSA." *Id.*

Similarly, in *Miller,* a railroad employee brought suit for cumulative trauma occurring over the period of his employment caused by walking on large ballast. 858 A.2d at 1039. After reviewing the ballast regulations promulgated pursuant to the FRSA, the Maryland Court of Special Appeals held that these regulations did not preclude the FELA suit. *Id.* at 1050. In support of its holding, the court stated

Even a surface glance at the FRSA regulation relied on by CSX persuades us that it does not touch, let alone pervasively cover, the railroad yard conditions that allegedly fell short of the safe and healthy workplace environment that CSX was obligated to provide for its

employees. The regulation is concerned with the track and its immediately adjoining area and not with railroad yards. The obvious concern, moreover, is with the safety of the train, the prevention of derailments, and not the quality of the work place provided for employees.

*Id.*

Finally, in *Elston*, a railroad employee alleged that, while walking alongside the tracks, he slipped and fell on steeply pitched, snow-covered "ballast" and injured his knee. 74 P.3d at 481. He alleged that the railroad was negligent under FELA for failing to provide reasonably safe walkways alongside its mainline tracks. *Id.* The Colorado Court of Appeals noted that "[u]nlike the issues of excessive speed and inadequate warning devices that are expressly covered in the FRSA, the issue of walkways is not explicitly addressed in the federal safety regulations." *Id.* at 487. The court stated that the regulations cited by the railroads "are directed at promoting a safe roadbed for trains, but offer no indication whether a railroad has a duty to provide safe walkways for employees alongside its tracks" and rejected the railroad's contention that its compliance with the FRSA's track safety standards precludes a finding of negligence under FELA. *Id.* at 488. And like the court in *Grimes*, the *Elston* court found that "[n]othing in the language of the FRSA conflicts with or undermines the primary function of FELA." *Id.* The court further noted "the purpose of the FRSA, to promote safety in all areas of railroad operations and reduce railroad related accidents, ... is consistent with the goal of FELA, to promote employee safety and

hold railroads liable for injuries caused by their negligence." *Id.*

The PTRA contends that the above cases are "flatly contradicted" by the Fifth Circuit's holdings in *Mopac I* and *Mopact II*. In *Mopac I*, a group of railroads alleged that proposed railroad safety regulations promulgated by the Texas Railroad Commission were preempted by regulations promulgated under the FRSA. 833 F.2d at 572. One of the proposed regulations, section 5.619, required "smooth, maintained properly sloped walkways which are level with the tops of the ties along both sides of all tracks within rail-yards and the tracks adjacent thereto, in an effort to provide safer working conditions for employees working on or around the tracks." *Id.* at 572 n. 1.[4] The court noted that this proposed regulation "establishes walkway surface, slope, and width specifications and requires walkways to be constructed along both sides of all tracks within rail yards." *Id.* at 574. The court further noted that the required walkways would "sit atop and adjoin the roadbed for which FRA has prescribed minimum specifications" and that federal regulations "govern[ed] roadbed, track geometry and track structure and specifically cover[ed] areas 'adjacent to the roadbed,' as well as track gauge, alignment, surface, ballast, drainage and component parts." *Id.* While the commission argued that the proposed regulation was not preempted because federal regulations did not mandate walkways, the court rejected, as too simplistic, the argument that, in considering the preemption issue, the federal regulation should be analyzed "in terms of its precise safety concerns." *Id.* The Fifth Circuit stated that "assuming walkways are integrally related to track structure and com-

---

4. Section 5.619 also required that walkways be surfaced with "crushed materials not to exceed 1½ inches in size or with asphalt, concrete, secured planking, grating, or similar material." *Mopac II*, 948 F.2d at 184 n. 4.

position," it would be impracticable and inconsistent with the FRSA's intent to establish national rail safety standards if "50 states could establish individual walkway regulations in addition to the FRA standards." *Id.* While the court ultimately held that "there [was] a material fact issue concerning the interrelationship between the state walkway requirement and federal track regulations," and remanded the issue to the district court for a trial, it provided the district court with the following guidance:

> It likewise appears in this case that the Commission may seek to enforce 'different or higher standards' of track construction by superimposing the walkway requirement on federal track geometry and structure regulations. This would be the case if, from a practical standpoint, the width, surface and slope requirements of the state walkway regulation generally add to the FRA standards by requiring the railroad to strengthen or enlarge the roadbed beyond FRA requirements.

*Id.* at 574–75.[5]

On remand the district court, after considering expert testimony from both sides, found that "the roadbed would in fact have to be enlarged laterally and strengthened in order to support the walkway" and that the "body of material used to support the walkway would have to adjoin the roadbed in such a way that it would be integrated with it," and, thus, held that the proposed state regulation was preempted. *Mopac II,* 948 F.2d at 183. The Fifth Circuit, this time limiting its review of the district court's factual findings for clear error, held that, while both sides presented "convincing evidence," it could not reverse the lower court's finding when "there [were] two or more permissible views of the record evidence." *Id.* at 184. The court concluded, "the state provisions would still require the railroads to enlarge and strengthen existing roadbeds to accommodate the walkways—which is enough to support a finding of preemption." *Id.*

The PTRA, in support of its preclusion argument, also cites to *Norfolk & Western Railway Co. v. Public Utilities Commission of Ohio,* 926 F.2d 567 (6th Cir.1991); *Black v. Seaboard System Railroad,* 487 N.E.2d 468 (Ind.Ct.App.1986); and *Black v. Baltimore & Ohio Railroad Co.,* 398 N.E.2d 1361 (Ind.Ct.App.1980). In *Norfolk & Western Railway Co.,* the United States Court of Appeals for the Sixth Circuit held that FRA regulations preempted a state regulation requiring railroads to provide walkways and railings for trainmen along the side of railroad bridges. 926 F.2d at 571. The court noted that the FRA had previously directly addressed the issue of railroad bridge walkways and decided that a general bridge walkway requirement was not necessary because such a rule "would impose significant added burdens in terms of the large dollar cost to the railroad industry for construction of the walkways, the added hazard to persons and property and additional liability exposure for the railroads because of increased trespassing, and the possible decrease in overall railroad safety because of the di-

---

5. The court offered an example of a state regulation that it would not consider to "cover the subject matter" of an FRA regulation. The court stated

> If the Commission sought to regulate walkway safety by requiring railroads to post signs wherever the walkways were slippery or obstructed, we would not find this

preempted. Not only does [this] hypothetical regulation address a hazard not specifically covered by FRA regulations ... but its implementation in no way adds to the FRA's basic track construction regulations or impairs FRA's superintendence of that field.

*Id.* at 575 n. 5.

version of resources from other maintenance and improvement projects." *Id.* at 570–71 (quoting 42 Fed.Reg. 22185 (May 2, 1977)).[6] Thus, the FRA affirmatively determined that issuance of federal regulations requiring walkways on bridges was "not warranted based on the projected cost of installation and the collateral safety problems which would be created." *Id.* at 571 (citing 43 Fed.Reg. 10586 (Mar. 14, 1978)). The finding of preemption in *Norfolk & Western Railway Co.* is strictly limited to regulations requiring walkways on bridges. *Id.* In *Seaboard System Railroad,* the Indiana Court of Appeals held that the state public service commission was preempted from acting on a complaint concerning walkway conditions along roadbeds between Bloomington, Indiana and Louisville, Kentucky. 487 N.E.2d at 469. The complaint urged the commission to "recommend standards for the construction and maintenance of walkways to protect the safety of employees." *Id.* at 468. The court noted that "[a]lthough unsafe walkways have not been the subject of specific federal regulations, the regulations as adopted indicate a congressional determination to regulate the entire railroad area" because "[w]alkways are part of the track structure and rail system that in general present an area preempted by the [FRA]."[7] *Id.* at 469. The court concluded that the condition of the walkways did not

present "a distinctively local safety hazard which would authorize state action under section 434." *Id.* Similarly, in *Baltimore & Ohio Railroad Co.,* the Indiana Court of Appeals held that the state public service commission was preempted from acting on a complaint alleging that inadequate pumping, lack of good cross ties, ballast, and poor drainage had created muddy conditions that were hazardous to railroad employees. 398 N.E.2d at 1362. The court held that "the issuing of regulations dealing with track structure and roadbed, although not dealing specifically with the muddy conditions" were "sufficient to demonstrate an intent by the federal government to regulate the entire area associated with track structure and track roadbed." *Id.* at 1363. We do not read these cases from the Indiana Court of Appeals as indicating that any and all FELA claims brought by an individual employee that in any way relate to walkway conditions or ballast size are automatically precluded. To the extent these cases can be interpreted to hold as such, we must respectfully disagree.

We conclude that the *Mopac* cases are not dispositive of Hendrix's FELA negligence claims. The PTRA asserts that "[o]ne of the lessons taught by *Mopac I* and *Mopac II* is that efforts to enlarge or impose duties on a railroad beyond those created by the FRA regulations are

---

**6.** The FRA further stated that "neither the commenters nor the FRA has been able to demonstrate that such a rule would result in a definite or measurable improvement to railroad employee safety. Finally, if an employee safety problem does exist because of the lack of walkways in a particular area or on a particular structure, regulation by a State agency that is in a better position to assess the local need is the more appropriate response...." *Norfolk & Western Railway Co.,* 926 F.2d at 571 (quoting 42 Fed.Reg. 22185 (May 2, 1977)).

**7.** The court also noted

Notwithstanding the fact that regulations have been adopted on the subject, a state may "continue in force an additional or more stringent law, rule, regulation, order, or standard ... when necessary to eliminate or reduce an essentially local safety hazard." ... Thus, a complaint alleging an immediate safety hazard of particular local concern, such as the temporary placement of radioactive materials in the walkways, would be actionable by a state agency. *Black v. Seaboard Sys. R.R.,* 487 N.E.2d 468, 469 (Ind. Ct.App.1986)

preempted." Thus, the PTRA asks this court to hold, based on *Mopac I* and *II*, that a railroad employee cannot seek to impose any duty on his employer beyond those imposed by federal regulations promulgated under the FRSA. However, such a holding would eviscerate the rights of a railroad employee to bring a FELA action against his railroad employer for negligence in the workplace. A careful reading of the *Mopac* cases reveals that these cases do not support the PTRA's far reaching position. In *Mopac I,* the Fifth Circuit "held that summary judgment was inappropriate with regard to [the Texas regulation governing walkways] because there existed 'a material fact issue concerning the interrelationship between the state walkway requirement and federal track regulations.'" *Mopac II,* 948 F.2d at 181 (quoting *Mopac I,* 833 F.2d at 575). In *Mopac II,* in conducting its review of the trial court's findings for clear error, the Fifth Circuit emphasized that both the railroad and the commission presented "convincing evidence" in the form of expert testimony concerning the interrelationship of the federal regulation and the proposed state regulation. *Id.* at 184. Specifically, the railroad's expert testified that "in order to accommodate the walkways required by section 5.619, the track support structures would have to be enlarged" and that "the smaller material mandated by the state walkway regulation, during regular maintenance procedures, would mix with the larger material under the track" and "cause drainage problems and weaken the ability of the track structure to support train traffic." *Id.* at 183–84. The commission's experts testified that "walkways are not an integral part of the track structure because they do not bear the load created by the train traffic," that "federal regulations apply only to traffic bearing portions of the roadbed," and that "there would be no drainage

problem because the material used in constructing the walkways would be permeable." *Id.* The Fifth Circuit's actual holding is quite limited because it merely noted that the district court found the railroad's evidence more persuasive, more credible, and more convincing, and that it could not say "that the district court's choice [was] clearly erroneous." *Id.* at 184.

Thus, as recently noted by the United States District Court for the Southern District of Texas, the *Mopac* decisions direct trial courts "to avoid resolving this type of preemption issue on summary judgment." *Fernow v. Burlington N. & Santa Fe Ry. Co.,* 109 F.Supp.2d 678, 680 (S.D.Tex.2000). In *Fernow,* a railroad employee alleged that he was injured as a result of his employer's negligence in failing to provide a safe working environment when a poorly maintained walkway, located away from the railroad track and embankment, caused him to fall and injure himself. *Id.* at 678–79. The employee also alleged that the railroad failed to provide a reasonably safe walkway in accordance with provisions in the Arizona Administrative Code. *Id.* at 679. The *Fernow* court stated that, based on the record before it, it was "uncertain whether Arizona's walkway specifications require the railroad to strengthen or enlarge the roadbed beyond federal requirement, or alternatively whether the regulations contravene federal law." *Id.* at 681 n. 2. The court further stated that "[t]o answer such questions, the parties will need to present testimony from railroad engineers, safety inspectors, and the like." *Id.* (citing *Whitley v. S. Pac. Transp. Co.,* 136 Or.App. 426, 902 P.2d 1196, 1204 (Or. 1995)).

■ Finally, the PTRA argues that "negative preemption of ballast regulation also exists by virtue of the FRA's response to the Rail Safety Enforcement Act of 1992." The PTRA asserts that the FRA

revisited its regulation of track safety standards from 1992 until 1997 and that the FRA determined that the ballast regulation in section 213.103 should remain as currently written. The PTRA contends that this is evidence of the FRA "affirmatively evaluating and occupying the field of track and walkway ballast specifications, which leaves no room for inconsistent determinations by the courts or juries." Like the Fifth Circuit in *Mopac I,* we reject the PTRA's contention that the FRA, by declining to promulgate various walkway regulations, has "specifically intended to 'cover the subject matter' of walkways so as to preempt state regulations." *Mopac I,* 833 F.2d at 575. In *Mopac I,* the court reasoned that the FRA's decision not to promulgate specific track walkway provisions did not suggest "that the FRA has decided as a matter of policy that walkway regulations must be national in character and must preempt state action." *Id.* at 576. We agree with this reasoning, and conclude that the Secretary of Transportation's failure to promulgate regulations that address walkway conditions or the size of ballast in rail yards does not automatically preclude, as a matter of law, claims brought by Hendrix under FELA that are in any way related to walkways and ballast.

Like the court in *Fernow,* we note that the record before us is devoid of testimony from railroad engineers and safety inspectors concerning the issues that underlie the preemption inquiry and we are unable to determine from the record whether the railroad would be required to strengthen or enlarge the roadbed beyond federal requirements or in contravention of federal law in order to address or remedy the complaints made by Hendrix related to the ballast in the rail yard walkway and the general rail yard conditions. We recognize that, in considering whether Hendrix's claim is preempted, we should not simply analyze the federal regulations in terms of their "precise safety concerns." However, the FRSA does not preclude, as a matter of law, any and all employee FELA claims that relate to or touch upon walkway conditions and the size of rail yard ballast. Accordingly, we hold that the trial court erred in granting summary judgment on the ground that Hendrix's FELA claims are precluded by the FRSA.

We sustain Hendrix's first issue.

## Non–Ballast Claims

In his second issue, Hendrix contends that the trial court erred in granting summary judgment as to his other "causes of action and theories of recovery" not addressed in the PTRA's summary judgment motion. Appellant notes that he "pled specific acts of negligence under the FELA other than those related to ballast and safe walkways." In response, the PTRA contends that Hendrix's own testimony "established that the sole cause of his injuries was a claim precluded by federal law" and that "Hendrix failed to present any argument or any evidence regarding any other alleged cause."

A motion for summary judgment must stand or fall on the grounds expressly presented in the motion. Tex.R. Civ. P. 166a; *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996); *Perry v. Greanias,* 95 S.W.3d 683, 700 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). "We are restricted to reviewing the propriety of the granting of the summary judgment on the basis of the grounds actually asserted in the motion for summary judgment." *Cates,* 927 S.W.2d at 626; *Perry,* 95 S.W.3d at 700–01. It is reversible error to grant a summary judgment motion on a claim not addressed in the motion. *Chessher v. Sw. Bell Tel. Co.,*

658 S.W.2d 563, 564 (Tex.1983); *Perry*, 95 S.W.3d at 701.

 Here, the sole issue presented by the PTRA's summary judgment motion was whether Hendrix's "FELA allegations of improper ballast [were] preempted by the FRSA." In the conclusion of its motion, the PTRA repeated its specific contention that Hendrix's "ballast claims concerning the nature and size of the ballast" were preempted. Contrary to the PTRA's assertion, Hendrix's allegations concerning the ballast were not the "sole basis of Hendrix's suit." In Hendrix's third amended petition, Hendrix repeated his initial allegations, made more specific allegations concerning the PTRA's alleged negligence in regard to the size of the ballast in the rail yard walkway, and added allegations that the PTRA was negligent in pressuring switching crews to work faster, reducing crew sizes and overworking crew members, sending Hendrix back to work with a weak ankle, abandoning certain safety rules, failing to hire a sufficient number of switchmen, and failing to provide Hendrix with the necessary equipment in order to perform his job. The PTRA's summary judgment motion did not address these claims, but instead focused solely on the issue of whether Hendrix's ballast claims were preempted. Contrary to the PTRA's assertion, Hendrix was not required to raise a fact issue or present evidence concerning his non-ballast claims in response to the PTRA's summary judgment motion, which, by its plain terms, did not address the non-ballast claims. Because the PTRA's summary judgment motion did not address Hendrix's non-ballast claims, we hold that the trial court erred in granting the PTRA's summary judgment motion as to his non-ballast claims.

We sustain Hendrix's second issue.

**Conclusion**

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.