38 A.3d 445

CSX TRANSPORTATION, INC.

v.

Edward L. PITTS, Sr.

No. 837, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Feb. 8, 2012.

Reconsideration Denied March 30, 2012.

344

See also, 2010 WL 2850231.

350

J. Christopher Nosher, Annapolis, MD (Setliff Turner & Holland, PC, C. Stephen Setliff, Annapolis, MD, Evan M. Tager, Andrew E. Tauber, Carl J. Summers, Washington, DC), all on the brief, for appellant.

P. Matthew Darby & H. David Leibensperger, Towson, MD (Berman, Sobin, Gross, Feldman & Darby, LLP, Towson, MD, C. Richard Cranwell, Cranwell, Moore & Emick, PLC, Roanoke, VA), all on the brief, for appellee.

Panel: EYLER, DEBORAH S., GRAEFF and WATTS, JJ.

WATTS, J.

This case involves an action brought by Edward L. Pitts, Sr., appellee, against his employer, CSX Transportation, Inc., appellant, under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* ("FELA"), for damages allegedly incurred during forty years of employment with appellant. Appellee

sought damages for various injuries including osteoarthritis of the knees allegedly caused by "large ballast," or crushed rocks, used by appellant in rail yards and on walkway surfaces. Following a six-day trial, a jury sitting in the Circuit Court for Baltimore City returned a verdict in favor of appellee for a total of $1,246,000 in economic and non-economic damages.[1] After denial of post-trial motions, appellant noted this appeal.

On appeal, appellant presented five issues[2] which we have rephrased and reordered as follows:

I. Whether appellee's FELA action is precluded by federal law, specifically, 49 C.F.R. § 213.103, a regulation promulgated under the Federal Railroad Safety Act ("FRSA")?

II. Whether the circuit court erred in allowing the testimony of two of appellee's witnesses over appellant's objection?

---

**1.** The jury awarded a total of $1,780,000 in damages, but apportioned only 70% of those damages to appellant, thereby reducing the total award to $1,246,000. The jury apportioned the remaining 30% of the damages as follows: 20% to appellee and 10% to other causes.

**2.** Appellant raised the issues thus:

I. Whether [appellee's] claim that he was injured by walking and working on material used to support [appellant's] train tracks is precluded by federal law.

II. Whether a new trial is required because the trial court allowed [appellee] to inject irrelevant and highly prejudicial material into the case through two witnesses who offered no relevant, non-duplicative testimony.

III. Whether a new trial is required because the trial court erroneously instructed the jury that (i) FELA was enacted "in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results thereof"; and (ii) CSXT's violation of a statute is evidence of negligence, when there was no evidence of a statutory violation.

IV. Whether a new trial on damages is required because the trial court prevented [appellant] from cross-examining [appellee's] economist about information from which the jury could have found that [appellee] would have retired years earlier than he claimed.

V. Whether the damages are excessive.

III. Whether the circuit court erred in preventing appellant from cross-examining appellee's economist as to statistics concerning a railroad employee's average age of retirement?

IV. Whether the circuit court erred in instructing the jury as to underlying policy considerations of FELA and as to the violation of a statute as evidence of negligence?

V. Whether the circuit court erred in denying appellant's motion for new trial and/or remittitur on the grounds that the jury's verdict was not excessive?

For the reasons set forth below, we answer all five questions in the negative and, therefore, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1970, at age nineteen, appellee began his railroad career with appellant's predecessor.[3] Appellee began in the track department, where he worked for four months, installing anti-creepers[4] and generally maintaining the tracks. In September 1970, appellee transferred to train service. Appellee was drafted and served in the military from March 1971 through December 1972.

When he returned to the railroad, appellee began working in the train and engine department where he spent the remainder of his railroad career. From December 1972 until June 1974, appellee worked as a brakeman conductor. A brakeman is someone who "rides on the train with the engineer," dismounts trains to throw the switches which physically move the rails to change the direction of the train from one track to another, and connects or knocks the brakes off of rail cars. At trial, appellee testified that in his time as a brakeman, he threw fifty to seventy-five switches daily, which required squatting or kneeling to unlock the switch, pull the

---

3. Appellant's predecessor is not identified in the record.

4. An anti-creeper is "a device attached to the railroad rail to keep it from moving longitudinally." Merriam–Webster's Dictionary (2012), http://www.merriam-webster.com/dictionary/anticreeper.

switch up, and throw it over. Appellee testified that he connected fifty to seventy-five air brake hoses daily, squatting and lifting the hoses up and "coupling them up." Appellee dismounted moving equipment seventy-five to one hundred times daily. Appellee estimated that overall, he walked approximately five to six miles per day while acting as a brakeman. According to appellee, he conducted most of these tasks on surfaces usually consisting of "the big ballast." [5]

---

5. Before proceeding, we will define the terms "ballast," "rail yard," and "walkways" and their significance in the context of railroad operations. In *CSX Transp., Inc. v. Bickerstaff*, 187 Md.App. 187, 201–02, 978 A.2d 760, *cert. denied*, 411 Md. 600, 984 A.2d 244 (2009), speaking through Judge Patrick L. Woodward, this Court, recently explained:

A rail yard consists of rows of parallel railroad tracks where trains are parked, taken apart, and reconfigured into different trains. One or more mainline tracks connect the rail yard to [the] rail network.

The surface of [ ] rail yards consists of ballast, slag, and cinders. Railroad "ballast," or crushed rock, is the most common surface material and has many different functions depending on its location in the yard. Ballast supports the railroad tracks and track structures, facilitates drainage, and provides a walking surface for railroad employees.

Ballast is graded in different sizes. Large ballast, also termed mainline ballast or track ballast, is about 1″ to 2 3/4″ in size. Mainline ballast best supports the railroad tracks and facilitates track drainage. Small ballast, or walkway ballast, is much smaller than mainline ballast, ranging in size from 3/8″ to 1″. The presence of small ballast in the rail yards provides a relatively safer walking surface. Mainline ballast is not necessary for drainage in the yard as it is on the tracks, because railroads can construct underground drainage systems, which provide adequate drainage for the track system. When mainline ballast is used in the rail yards, it is unstable to walk on and poses a slip and fall hazard.

(Footnotes omitted).

Although Maryland appellate courts have not explicitly defined the term "walkways," both *Bickerstaff*, 187 Md.App. at 261–64, 978 A.2d 760, and *CSX Transp., Inc. v. Miller*, 159 Md.App. 123, 167–71, 858 A.2d 1025 (2004), *cert. dismissed*, 387 Md. 351, 875 A.2d 702 (2005), relied on cases in which walkways were described. From those cases, it is evident that "walkways" are the paths alongside the tracks and in the rail yards where employees are expected to walk in order to complete their job duties. *See Grimes v. Norfolk Southern Railway Co.*, 116 F.Supp.2d 995, 1002 (N.D.Ind.2000) ("walk[way] alongside the train"); *Bickerstaff*, 187 Md.App. at 263, 978 A.2d 760 ("walkways in the rail yards"); *Hendrix v. Port Terminal R.R. Assoc.*, 196 S.W.3d 188, 192 (Tex.App.2006) ("yard walkway"); *Elston v. Union Pac. R.R. Co.*, 74 P.3d 478, 488 (Colo.App.2003) ("walkways alongside [the] tracks").

From June 1974 until the late 1990's, appellee worked mainly as a fireman, hostler and brakeman, with some time spent serving as an engineer. According to the parties, a fireman is someone who works with, assists, and trains under the supervision of an engineer. An engineer is someone who conducts daily inspections of trains, which involves getting on and off of the motors, walking around the motors, and getting off and throwing switches. A hostler is someone who moves engines around, including splitting, cutting, and turning them. Appellee estimated that as a fireman and hostler, he walked approximately two miles per day. Appellee estimated that overall, from 1974 until the late 1990's, he walked two miles per day in rail yards on large ballast.

From the late 1990's through the time of trial in April 2010, appellee worked as an engineer, walking approximately a half a mile to one and a half miles a day. At the time of trial, appellee was fifty-nine years old and still working as an engineer. Appellee estimated, that in his position as an engineer, he continues to throw approximately five or six switches and connects approximately ten air brake hoses daily. According to appellee, throughout his career, he performed various other tasks, including: walking to and from engines in train yards, climbing in and out of rail cars, walking around and inspecting engines, and squatting to look at brake shoes. Overall, appellee performed most of his tasks on rail yard surfaces consisting of large ballast.

Appellee first began experiencing difficulties with his knees around 2003 and 2004. Appellee testified that his knees bothered him when performing certain basic tasks at work, including walking up and down steps and ladders. Appellee sought medical attention in February 2007 and his doctor advised him that he should have surgery on his right knee to remove the cartilage and torn muscle. Appellee decided not to have surgery at that point, but later returned to his doctor as the pain in both knees worsened. The doctor recommended that appellee undergo surgery on both knees. Appellee underwent arthroscopic surgery on both knees in January 2008. By that time, the doctor had indicated that appellee had

osteoarthritis in his knees, including torn muscles and cartilage "floating around" and his knees had a general worn down "crab meat" type of appearance.

After five months of recovery, which included bi-weekly physical therapy for two months, appellee returned to work. Upon his return to work, over time, appellee's knees worsened and again became painful. Following the surgery, appellee received numerous gel lubricant injections in his knees, and is expected to receive the injections in "two series of three injections in each knee twice a year" as part of continuing treatment. According to appellee's expert witnesses, appellee's knees will worsen over time, and he will need replacement surgery on one or both of his knees.

Appellee brought suit under FELA in December 2008, alleging negligence on the part of appellant in the use of "large ballast" in rail yards and on walkway surfaces, and seeking damages for injuries, including those to his knees. In April 2010, a six-day trial was held in the circuit court. During the course of the trial, two of appellee's witnesses, Robert Jenkins and Robert Howe, testified over appellant's objections. Jenkins, who testified via videotape recorded deposition, is a retired conductor who worked for appellant in Jacksonville, Florida. Howe, who testified in person at the trial, is a conductor who, at the time of trial, worked for appellant in Hamlet, North Carolina. Both Jenkins and Howe served as local union chairpersons for the United Transportation Union while working for appellant.

Jenkins and Howe testified that they forwarded complaints to appellant from other railroad employees about the use of large ballast. Appellant objected to Jenkins and Howe's testimony on the grounds that the testimony was prejudicial and cumulative of testimony given by appellee's expert, Dr. Robert Andres. After argument from counsel, the circuit court overruled appellant's objections, stating that while the testimony "may be partially duplicative in part, the Court does not believe that it is so prejudicial that it outweighs the

probative value for this trier of fact to be aware of the actual notice of the conditions as received."

During trial, the circuit court sustained several objections which appellant alleges prevented full cross-examination of appellee's economics expert, Dr. Bruce Hamilton, about statistics as to a railroad employee's average age of retirement. At the end of the trial, the circuit court instructed the jury as follows:

It is clear and stipulated that [appellee] in this case is a railroad employee and therefore the activities and issues in this case are, in fact, covered under the Federal Employers['] Liability Act or what you may hear be referred to by the acronym of FELA, F–E–L–A.

Again, the Federal Employers['] Liability Act. That Act provides in substance that every railroad engage[d] in [interstate] commerce shall be liable in damages for injuries to [its] employees resulting in whole or in part from the negligence of any of [its] officers, agents or employees or from any defect or deficiency from [its] negligence in [its] cars, machinery, track, road bed or work areas.

You're further instructed that the Federal Employers['] Liability Act or FELA provides a cause of action to the railroad employee engaged in this [interstate] commerce for personal injury caused in whole or in part by the negligence by any of [its] carriers, employees or agents again, or by defects due to the [carrier's] negligence.

For your own understanding, if you would please, is that the Federal Employers['] Liability Act was, in fact, enacted back in 1908, while we were all young kids I take it.

The reason, if you will, is not as much of a debate in this case, but it was in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results thereof.

The Federal Employers['] Liability Act impose on the Defendant railroad a duty to [its] employees and to all of [its] employees including [appellee] to exercise reasonable care to provide the employee with a reasonably safe place in

which to work, reasonably safe conditions to work and reasonably safe tools and equipment.

* * *

You're instructed that the violations of the statute which is [causally] related to the injury in question may be considered by you as evidence of negligence.

If you find from the evidence that there was a violation of the statute which is [causally] related, you may consider such violation as evidence of negligence.

After the instructions, the circuit court held a brief bench conference. At that time, appellant noted exceptions to the instructions regarding the purpose of FELA and the violation of a statute as evidence of negligence. After closing arguments and deliberations, the jury returned a verdict in favor of appellee for an unadjusted total of $1,780,000 in damages. Appellant filed two post-trial motions: a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial and a Motion for the Exercise of Revisory Power to Vacate the Judgment Entered in the Case Based on Irregularity. The circuit court denied the motions.[6]

## DISCUSSION

### I.

Appellant contends that the FRSA and the regulations issued thereunder preclude appellee's claims because the FRSA preempts State and common law requirements concerning subject matter covered by the Act. Relying on *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426 (6th Cir.2009), *cert.*

---

6. On June 11, 2010, the circuit court denied the Motion for the Exercise of Revisory Power to Vacate the Judgment Entered in the Case Based on Irregularity. On June 25, 2010, appellant noted an appeal. On September 1, 2011, the circuit court denied the Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial. On September 23, 2011, appellant filed a Notice of Appeal as to the denial of the Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial. On November 28, 2011, this Court granted a joint motion to consolidate the appeals.

*denied,* —— U.S. ——, 130 S.Ct. 1136, 175 L.Ed.2d 971 (2010), appellant asserts that "negligence claims under FELA are *precluded* by the FRSA to the same extent that negligence claims under state law are *preempted* by the FRSA." Appellant argues that 49 C.F.R. § 213.103 precludes FELA claims such as those brought by appellee because the regulation allegedly covers the size and type of ballast used by railroads in mainline and secondary track.

Appellant contends that preclusion is appropriate in cases involving ballast used for track support regardless of the location of the ballast. Appellant maintains that this case is distinguishable from *Bickerstaff* and *Miller,* cases in which this Court found State actions are not precluded, because the case involves ballast used in areas requiring track support, not ballast used in areas uninvolved with track support.

Relying on *Bickerstaff* and *Miller,* appellee responds that 49 C.F.R. § 213.103 has no preclusive effect on FELA claims involving negligent ballast choice within rail yards and walkways, and that, in this case, appellee's duties were not confined to areas of track support, where a FELA claim for negligent ballast choice may be precluded. Appellee contends that Congress did not intend to regulate the use of materials in rail yards or walkways when creating regulations on track safety standards. Appellee argues that a majority of courts in other jurisdictions, in examining the preclusive effect of 49 C.F.R. § 213.103 on FELA claims, have held there is no preclusion of claims involving use of ballast in rail yards or walkways. In sum, appellee asserts that the subject of his claim—the negligent choice of ballast in rail yards and walkways—is not covered by the plain language of 49 C.F.R. § 213.103 nor did Congress intend it to be covered by the FRSA regulation. We agree.

## FELA

 FELA creates a cause of action for railroad employees injured on the job due to the negligence of employers. FELA provides:

Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. A railroad employee has the choice of bringing a FELA claim in either State or federal court. 45 U.S.C. § 56. FELA actions brought in State court, although subject to State procedural rules, are governed by federal substantive law. *St. Louis Sw. Ry. Co. v. Dickerson,* 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985). In *Miller,* 159 Md.App. at 129, 858 A.2d 1025, we noted a FELA case is a hybrid, a cross between workers' compensation and common law negligence cases. FELA actions have several quirks, including the elimination of the defenses of contributory negligence and assumption of the risk. *Id.* at 137, 858 A.2d 1025.

The Supreme Court has held repeatedly that FELA is to be construed liberally to provide for easy recovery by an injured railroad employee in a FELA action. *See Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 74 L.Ed. 1082 (1930), *superseded by statute on other grounds as stated in* 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); *Kernan v. Am. Dredging Co.,* 355 U.S. 426, 432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). Because FELA is a "broad remedial statute," courts "have adopted a standard of liberal construction in order to accomplish Congress's objects." *Norfolk S. Ry. Corp. v. Tiller,* 179 Md.App. 318, 326, 944 A.2d 1272, *cert. denied,* 405 Md. 292, 950 A.2d 829 (2008) (quotations, alterations, citations, and emphasis omitted). FELA cases have a different standard of review than common law negligence cases. *Tiller,* 179 Md. App. at 324–26, 944 A.2d 1272. In *Tiller,* 179 Md.App. at 324, 944 A.2d 1272, we stated that an "employee-friendly standard of review" is applied in FELA cases, noting that such cases "call[ ] for an interpretive approach that is significantly differ-

ent from that which ordinarily prevail[ ] in a suit for common law negligence." Given this employee-friendly standard of review and liberal construction, we have observed that "it is not hard to figure out who wins the ties and who gets the benefit of the close calls." *Miller*, 159 Md.App. at 145, 858 A.2d 1025.

## The FRSA

Railroads are governed by the FRSA. 49 U.S.C. § 20106, a provision of the FRSA, provides that some actions brought in State courts are preempted by the statute. 49 U.S.C. § 20106 states that if the Secretary of Transportation or the Secretary of Homeland Security "prescribes a regulation or issues an order covering the subject matter of the State requirement," then the State requirement must give way to the federal requirement and any action brought based on that State requirement is preempted. *Id.* § 20106(a)(2). Congress has clarified, however, that not all State law causes of action are preempted by 49 U.S.C. § 20106(a)(2). 49 U.S.C. § 20106(b)(1) provides: "Nothing in [§ 20106] shall be construed to preempt an action under State law seeking damages for personal injury . . . alleging that a party—(A) has failed to comply with the Federal standard of care . . .; (B) has failed to comply with its own plan, rule, or standard . . .; or (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2)." FELA actions, therefore, are not entirely preempted under the FRSA.

■ The FRSA was created "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). The stated purpose of the FRSA was "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous material." FRSA of 1970, Pub.L. No. 91–458, 84 Stat. 971 (codified as 45 U.S.C. §§ 421 *et seq.*). The FRSA mandated that the Secretary of Transportation "pre-

scribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety[,]" and that the initial standards be issued no later than one year from the date of enactment—October 16, 1970. *Id.* The Secretary of Transportation delegated its authority under the FRSA to the FRA. 49 C.F.R. § 1.49(m). In exercising that authority and following the FRSA's mandate, on June 23, 1971, the FRA issued a Notice of Proposed Rule Making providing the language of the track safety standard regulations. 36 Fed.Reg. 20,336 (Oct. 20, 1971). On October 15, 1971, after considering all of the comments submitted in writing and made at the public hearing held on August 2, 1971, the FRA amended the proposed track safety standards in order "to establish initial safety standards for track and track inspection[.]" [7] *Id.*

### 49 C.F.R. § 213.103—The Ballast Regulation

In 1971, the FRA promulgated 49 C.F.R. § 213.103, titled "Ballast; general," which provides as follows:

Unless it is otherwise structurally supported, all track shall be supported by material which will—

(a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;

(b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

(c) Provide adequate drainage for the track; and

(d) Maintain proper track crosslevel, surface, and alinement.

Two decades later, in 1992, Congress enacted the Rail Safety Enforcement and Review Act, 102 Pub.L. No. 365, 106 Stat. 972 (1992), which was later amended by the Federal Railroad Safety Authorization Act of 1994, 103 Pub.L. No. 440, 108 Stat. 4615 (1994), and codified at 49 U.S.C. § 20142. 63

---

**7.** Although the FRA did not document whether it received comments specifically regarding 49 C.F.R. § 213.103, it did not note any changes to be made to the proposed regulation. 36 Fed.Reg. 20,336 (Oct. 20, 1971).

Fed.Reg. 33,992 (June 22, 1998). The amended 49 U.S.C. § 20142 mandated:

(a) Review of existing regulations. Not later than March 3, 1993, the Secretary of Transportation shall begin a review of Department of Transportation regulations related to track safety standards. The review at least shall include an evaluation of—

(1) procedures associated with maintaining and installing continuous welded rail and its attendant structure, including cold weather installation procedures;

(2) the need for revisions to regulations on track excepted from track safety standards; and

(3) employee safety.

In response, the FRA amended the Track Safety Standards "to update and enhance its track safety regulatory program." 63 Fed.Reg. 33,992 (June 22, 1998). The FRA stated that the changes made would "improve track safety and provide the railroad industry with the flexibility needed to effect a safer and more efficient use of resources." *Id.* No comments were received and no changes were suggested for 49 C.F.R. § 213.103. 63 Fed.Reg. 34,006. The Track Working Group, the group reviewing the regulations, "recommended that [49 C.F.R. § 213.103] remain as currently written." *Id.* 49 C.F.R. § 213.103 has thus remained the same for over forty years.

## Relevant Maryland Case Law

This Court has previously examined preclusion of FELA actions where a claimant alleges negligent use of ballast. In *Miller*, 159 Md.App. at 146, 167, 170–71, 858 A.2d 1025, we held that a FELA action in which the plaintiff sought recovery for bilateral osteoarthritis of the knees allegedly caused by large ballast in rail yards and walkways alongside rail tracks was not precluded by 49 C.F.R. § 213.103. As to rail yards, in examining 49 C.F.R. § 213.103, with Judge Charles E. Moylan, Jr. speaking for this Court, we stated:

Even a surface glance at the FRSA regulation relied on by CSX persuades us that it does not touch, let alone pervasively cover, the **railroad yard conditions** that allegedly fell

short of the safe and healthy workplace environment that CSX was obligated to provide for its employees. The regulation is concerned with the track and its immediately adjoining area and not with railroad yards. The obvious concern, moreover, is with the safety of the train, the prevention of derailments, and not the quality of the work place provided for employees.

159 Md.App. at 167, 858 A.2d 1025 (emphasis added).

In *Miller*, relying on *Grimes*, 116 F.Supp.2d 995 and *Elston*, 74 P.3d 478, authorities from other jurisdictions in which courts rejected the preclusion argument, we held that 49 C.F.R. § 213.103 does not preclude FELA claims alleging negligent use of ballast on walkways. *Miller*, 159 Md.App. at 167–70, 858 A.2d 1025. *See Grimes*, 116 F.Supp.2d at 1002 ("Every circuit that has considered the issue of walkways [alongside the tracks] has concluded that the FRSA is silent on the question of walkways."); *Elston*, 74 P.3d at 487 ("Unlike the issues of excessive speed and inadequate warning devices that are expressly covered in the FRSA, the issue of walkways is not explicitly addressed in the federal safety regulations."). In *Miller*, 159 Md.App. at 170–71, 858 A.2d 1025, we concluded that walkways are not covered by the FRSA regulation and therefore a FELA action concerning the walkways is not precluded. Specifically, Judge Moylan stated:

> **If even walkways alongside the tracks are not covered, a fortiori, the walking surface throughout a railroad yard is not covered.**
>
> . . .
>
> We disagree with defendant that its alleged compliance with the FRSA's track safety standards precludes a finding of negligence under FELA. Because walkways are not covered by the FRSA, whether defendant complied with these regulations is immaterial in determining whether a reasonable person in defendant's situation would have provided **walkways alongside its tracks.**

*Id.* at 170–71, 858 A.2d 1025 (emphasis added).

Similarly, in *Bickerstaff*, 187 Md.App. at 201, 978 A.2d 760, we held that railroad employees' FELA claims were not

precluded by 49 C.F.R. § 213.103. *Bickerstaff* involved ballast used in rail yard walkways, not ballast used to support the mainline track. *Id.* at 263, 978 A.2d 760. With Judge Woodward speaking for this Court, we discussed our holding in *Miller,* the holding of the Court of Appeals of Georgia in *Norris v. Cent. of Ga. R.R. Co.,* 280 Ga.App. 792, 635 S.E.2d 179 (2006), and the holding of the Court of Appeals of Texas in *Hendrix,* 196 S.W.3d 188. *Bickerstaff,* 187 Md.App. at 262–64, 978 A.2d 760. In reviewing *Miller* and Norris, we concluded that:

> The Court's conclusion in *Norris* is entirely consistent with our decision in *Miller.* In *Miller,* we recognized that 49 C.F.R. § 213.103 governs the ballast along *the mainline track* and not *the ballast in the rail yard. See* 159 Md.App. at 167, 858 A.2d 1025. ("The regulation is concerned with the track and its immediately adjoining area and not with railroad yards.") In *Norris,* the testimony on which the appellant relied failed to show that he stumbled on ballast not located along the mainline track. 635 S.E.2d at 183–84. Therefore, the appellant in *Norris* did not establish that his negligence claim fell outside the purview of 49 C.F.R. § 213.103. *Id.* at 184. To the contrary, in the instant case, appellees rest their FELA claims on appellant's negligence in maintaining safe **walkways in the rail yards** and make no mention of alternate ways in which appellant might have supported its mainline track.

*Bickerstaff,* 187 Md.App. at 262–63, 978 A.2d 760 (some emphasis in original).

In *Bickerstaff,* 187 Md.App. at 263, 978 A.2d 760, we concluded that the opinion of the Court of Appeals of Texas in *Hendrix,* 196 S.W.3d 188, was consistent with *Miller.* In *Hendrix,* 196 S.W.3d at 201, the Court held that "the FRSA does not preclude, as a matter of law, any and all employee FELA claims that relate to or touch upon walkway conditions and the size of rail yard ballast." In *Bickerstaff,* 187 Md.App. at 263–64, 978 A.2d 760, after discussing *Hendrix* and recent authorities in which other courts declined to find that FELA claims involving ballast used in rail yards and on walkways

were precluded by 49 C.F.R. § 213.103, we stated that: "In light of the most recent case law on the issue of preclusion, we decline to reconsider our holding in *Miller.*"

## Relevant Case Law from Other Jurisdictions

In *Hendrix,* 196 S.W.3d at 201, a case decided after *Miller* and prior to *Bickerstaff,* the Court of Appeals of Texas held that a railroad employee's FELA claim was not precluded by 49 C.F.R. § 213.103. Hendrix was allegedly injured by large ballast used "in the [rail] yard walkways." *Id.* at 190. Hendrix maintained that his FELA claim was not precluded because "the federal regulations concerning ballast deal with the safety of the track, not the safety of employees working in and around the tracks." *Id.* at 193. The railroad argued that cases from other jurisdictions support the proposition that FELA claims alleging negligent use of ballast in walkways are precluded. *Id.* at 198–99. The railroad maintained that 49 C.F.R. § 213.103 specifically regulates ballast as a measure of track safety and that Hendrix's claim challenging the "nature and size of the ballast" was precluded regardless of the location of the ballast within the rail yard. *Id.* at 191. The Court of Appeals of Texas concluded that 49 C.F.R. § 213.103 does not preclude "any and all" claims related to walkway conditions *Id.* at 201.

In *Norris,* 635 S.E.2d at 183, the Court of Appeals of Georgia held that a railroad employee's FELA claim was precluded by 49 C.F.R. § 213.103. Norris was allegedly injured by large ballast while working on a mainline switch on one side of the mainline track. *Id.* at 181. Norris argued that because 49 C.F.R. § 213.103 did "not specify any particular size of ballast, . . . a jury should be allowed to decide whether smaller ballast should have been used[.]" *Id.* at 183. Norris attempted to argue that the ballast in the area where he was injured did not support the mainline track. *Id.* Unconvinced, the Court of Appeals of Georgia stated: "Essentially, Norris seeks to place the ballast upon which he stumbled outside the purview of 49 C.F.R. § 213.103. This regulation governs ballast relative to track support, but not necessarily other ballast

within a rail yard." *Id.* Because Norris's FELA claim rested on the means by which the main track was supported, and involved ballast used in an area of track support, the claim was precluded under 49 C.F.R. § 213.103. *Id.* at 183–84.

The Court of Appeals for the Sixth Circuit examined preclusion of FELA actions alleging negligent use of ballast and reached conclusions similar to those expressed by this Court in *Bickerstaff* and *Miller.* In *Nickels,* 560 F.3d at 428, the Court of Appeals for the Sixth Circuit held that railroad employees' negligence actions were precluded because 49 C.F.R. § 213.103 covered the issue of ballast size. The issue in *Nickels* involved ballast used for track support, not ballast used in other areas of the rail yard or on walkways. *Id.* In *Nickels,* 560 F.3d at 428, railroad employees claimed "that their former employers failed to provide a safe working environment by using large mainline ballast—instead of smaller yard ballast—underneath and adjacent to tracks receiving heavy foot traffic." The railroad employees argued that the employers "could have used smaller ballast in areas of heavy foot traffic without violating their duty to provide a stable track." *Id.* at 431. The Sixth Circuit held that 49 C.F.R. § 213.103 substantially subsumed the issue of ballast size used for track support, making no distinction between mainline and secondary track, and found that the regulation leaves the size and type of ballast to be used up to the "railroads' discretion so long as the ballast performs the enumerated support functions." 560 F.3d at 431. Tellingly, the Sixth Circuit made the following observation as to the railroad employees' claims:

The [railroad employees] note that 49 C.F.R. § 213.103 does not address "what constitutes a reasonably safe walkway for railroad employees performing their duties adjacent to the track." This suggests that the [railroad employees] allege negligence in the railroads' use of oversized ballast in areas completely separate from those where track stability and support are concerned. Such an allegation, however, does not appear in either of their complaints. Nickels alleges that "railroad ballast" was used by the [railroad] *to support the railroad track* . . . . Even to the extent that the [railroad

employees] argue oversized ballast was used "along," "adjacent to," or "parallel to" the track, they do not contend that the ballast in those areas was not being used for stability under § 213.103.

560 F.3d at 432–33 (footnote omitted) (emphasis in original).[8] The holding in *Nickels* was premised on the observation that the employees did not contend that ballast used on walkways was not used for stability, in other words for track support. *Id.*

In *Elston,* 74 P.3d at 487, the Court of Appeals of Colorado held that a railroad employee's FELA claim was not precluded by FRSA regulations. Elston, who was allegedly injured while walking alongside the tracks when he slipped and fell on ballast, brought suit under FELA alleging that the railroad was negligent for failing to provide reasonably safe walkways. *Id.* at 481. Elston "asserted that, because [the railroad employer] often require[d] its employees to walk the length of the train to make repairs or change train crews, defendant's failure to provide a reasonably safe walkway alongside the train created a foreseeable risk of harm that caused, in whole or in part, his injury." *Id.* at 482. The Court of Appeals of

---

8. In a strong dissent in *Nickels,* 560 F.3d at 433–36, Judge John M. Rogers stated:

Nothing in 49 C.F.R. § 213.103 or any related regulations addresses the issue of trackside walkways and ballast size. The regulations generally require adequate support for the trains, and advert in no way to the nature of a walking surface. . . . All of these provisions are primarily concerned with providing a stable track and roadbed. The provisions are essentially silent with respect to conditions of the walkways directly adjacent to the track.

560 F.3d at 433–34 (Rogers, J., dissenting) (footnotes omitted).

Courts have reviewed and commented on the *Nickels* decision. *See, e.g., Booth v. CSX Transp., Inc.,* 334 S.W.3d 897, 898, 901 (Ky.Ct.App. 2011) (The Court of Appeals of Kentucky held that Booth's FELA claim alleging injury from walking on "large and uneven ballast in CSX Louisville rail yards" was not precluded by 49 C.F.R. § 213.103. In reviewing the *Nickels* decision, the Court of Appeals of Kentucky noted that the Court in *Nickels* "deemed the issue of reasonably safe walkways for employees adjacent to the railroad tracks to be inseparable from the issues of track stability and support governed by the regulation. We, on the other hand, are persuaded by the well reasoned dissent in *Nickels* . . . ." (citation omitted)).

Colorado noted that "the issue of walkways is not explicitly addressed in the federal safety regulations." *Id.* at 487. Upon review of the FRSA's track safety standards, the Court of Appeals of Colorado concluded that FRSA regulations, including 49 C.F.R. § 213.103, "are directed at promoting a safe roadbed for trains, but offer no indication whether a railroad has a duty to provide safe walkways for employees alongside its tracks." *Id.* at 488. The Court of Appeals of Colorado noted that the railroad had "failed to adduce any evidence that the FRA, in promulgating the track safety standards, even considered the issue of safe walkways for railroad employees." *Id.* As such, the Court of Appeals of Colorado held that the FRSA regulations did not cover walkways, and Elston's FELA claim was not precluded. *Id.* at 487–88.

### Analysis

█ Returning to the case at hand, consistent with our holdings in *Bickerstaff* and *Miller*, and the myriad of other courts that have examined the issue, we conclude that the plain language of 49 C.F.R. § 213.103 demonstrates that the regulation applies to ballast used for track support. We find no merit in appellant's argument that the FRSA regulation "covers" or "substantially subsumes" the issue of ballast used in rail yards and on walkways. 49 C.F.R. § 213.103 is located within a subpart of the FRA's transportation regulations labeled "Track Safety Standards." The regulation mandates that "all track shall be supported by material" which can perform enumerated track support functions, and it is located within subpart "D" on "Track Structure." 49 C.F.R. § 213.103. Subpart "D" provides: "This subpart prescribes minimum requirements for ballast, crossties, track assembly fittings, and the physical conditions of the rails." 49 C.F.R. § 213.101. 49 C.F.R. § 213.103, on its face, does not require the use of ballast in rail yard areas or mention the safety of walking surfaces for railroad employees. Rather, 49 C.F.R. § 213.103 provides that "all track shall be supported by material which will—(a) Transmit and distribute the load of the

track and railroad rolling equipment to the subgrade; (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails; (c) Provide adequate drainage for the track; and (d) Maintain proper track crosslevel, surface, and alinement." As such, the regulation concerns the track itself and not conditions of rail yards or walkways. As we explained in *Miller*, 159 Md.App. at 167, 170, 858 A.2d 1025: "Even a surface glance at the FRSA regulation relied on by CSX persuades us that it does not touch, let alone pervasively cover, the railroad yard conditions that allegedly fell short of the safe and healthy workplace environment that CSX was obligated to provide for its employees[,]" and "[i]f even walkways alongside the tracks are not covered, . . . the walking surface throughout a railroad yard is not covered."

The legislative history of the regulation leads to the conclusion that claims involving ballast used in rail yards and walkways are not precluded. The legislative history of the FRSA regulation 49 C.F.R. § 213.103 demonstrates that Congress and the FRA have been largely silent as to ballast used in the rail yards and in walkways. The overarching theme through creation and amendment of the FRSA regulations has been one of track safety versus safety in employee working conditions. Indeed, as Judge Moylan pointed out in *Miller*, 159 Md.App. at 172, 858 A.2d 1025:

> Here, defendant has failed to point to a clear congressional directive that would lead us to interpret the FRSA track safety standards as precluding plaintiff's FELA claim. In fact, defendant has failed to adduce any evidence that the FRA, in promulgating the track safety standards, even considered the issue of safe walkways for railroad employees.

(quoting *Elston*, 74 P.3d at 488). Appellant has failed to demonstrate that Congress or the FRA intended 49 C.F.R. § 213.103 to cover ballast used in railroad employee walking areas, such as rail yards and walkways.

Relevant case law from this Court and other jurisdictions demonstrates that courts have consistently held that FELA claims concerning ballast used for track support are precluded by 49 C.F.R. § 213.103—not claims concerning ballast used in rail yards and in walkways.[9] In this case, in his Amended Complaint, appellee alleged that he was injured "as a result of his repeated walking on improper ballast **along the railroad tracks, in rail yards and other workplace areas.**" It is clear that appellee's claim extends beyond the ballast used for main line track support to the ballast used in rail yards and on walkways.

Our review of the record reveals that appellant did not present evidence at trial supporting its broad claim that ballast in rail yards and walkways provides track support. As appellee pointed out during oral argument, appellant failed to produce expert testimony or any evidence at trial supporting the contention that ballast used in the rail yards and in walkways provides track support as required by 49 C.F.R. § 213.103. Based on this circumstance alone, we are not persuaded to reconsider our holdings in *Bickerstaff* and *Miller*. It is clear, however, that whether reviewing the plain language of 49 C.F.R. § 213.103, the legislative history of the regulation, or relevant case law, FELA claims involving the use of ballast in rail yards and walkways are not precluded by 49 C.F.R. § 213.103.

## II.

Appellant contends that the circuit court erroneously admitted the testimony of two witnesses, Jenkins and Howe, over its objection, and that the testimony was "far more prejudicial than probative" and cumulative. Appellant contends the testi-

9. At oral argument, appellant argued that *Miller* is not controlling authority for this case because in it we did not address the issue of walkways. A review of the case, however, illustrates that this is not so. In *Miller*, 159 Md.App. at 147, 858 A.2d 1025, we specifically noted that it was "[o]f particular significance" that "the surface of the track **walkways** in or near the yards and the entire yards themselves was switched . . . to large ballast[.]" (emphasis added).

mony was unfairly prejudicial for the following reasons: (1) both Jenkins and Howe testified that, in their opinions, appellant "did not adequately respond to their complaints about the allegedly improper ballast in the yards in Jacksonville and Hamlet"; (2) "Jenkins went so far as to claim that, in his opinion, [appellant] management in Jacksonville would never fix the problem with large ballast because it supposedly would cost too much"; and (3) Jenkins "implied that Jacksonville management had concealed injury statistics related to large ballast." Appellant maintains that the testimony painted it in a bad light by informing the jury that appellant was unresponsive and indifferent to workers' safety, and had concealed injury statistics. Appellant argues the testimony lacked probative value and that the only potential relevance of the testimony was "to show notice through the complaints that [Jenkins and Howe] submitted to their local supervisors."

Appellant maintains that the subject matter of Jenkins's and Howe's testimony—previous complaints to appellant regarding large ballast—had already been addressed by appellee's ergonomics expert, Dr. Andres. Appellant contends that Dr. Andres testified regarding letters written by Jenkins and Howe in which they requested that appellant use small rather than large ballast in the rail yards [10] and, as such, the witnesses' testimony was cumulative.

Appellee urges this Court to find that appellant has not preserved an issue as to the testimony of Jenkins and Howe for appellate review. Appellee contends that appellant failed to argue that the testimony was unfairly prejudicial, failed to make contemporaneous objections during the testimony of Jenkins and Howe, and "some of th[e] testimony was actually given on cross-examination, *in response to questions posed by [appellant]*."

---

**10.** In a letter dated May 18, 1984, Jenkins requested that appellant use small ballast in the Jacksonville terminals and alleged that large ballast causes damage and injury to feet, legs, knees, and ankles of employees. In a letter dated August 21, 1992, Howe stated that unsafe working conditions were reported to him by railroad employees, specifically complaints regarding large ballast placed in the rail yard.

Alternatively, appellee maintains that, under Md. Rule 5–403, the probative value of Jenkins and Howe's testimony was not substantially outweighed by the danger of unfair prejudice. Appellee maintains that prior to Jenkins's and Howe's testimony, appellant "merely made bald allegations of prejudice, with no explanation of any prejudice," and that those allegations were properly considered and dismissed by the circuit court. Appellee contends that the testimony of Jenkins and Howe was not cumulative because, although Dr. Andres referred to the letters written by Jenkins and Howe, the letters were not admitted into evidence or read to the jury in their entirety during the expert's testimony.

■■■■ "Rulings on the admissibility of evidence must normally be left to the sound discretion of the trial judge in actions under the Federal Employers' Liability Act." *Bickerstaff*, 187 Md.App. at 241, 978 A.2d 760 (citation omitted). In particular, when weighing evidence, "a trial court is given significant deference in its determination that probative evidentiary value outweighs any danger of prejudice." *S. Mgmt. Corp. v. Mariner*, 144 Md.App. 188, 197, 797 A.2d 110 (2002).

Prejudice, in the context of the balancing test, has been described as follows:

"Evidence is never excluded merely because it is 'prejudicial.' If prejudice were the test, no evidence would ever be admitted. Parties ... have a right to introduce prejudicial evidence. Probative value is outweighed by the danger of 'unfair' prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case."

*Moore v. State*, 84 Md.App. 165, 172, 578 A.2d 304, *cert. denied*, 321 Md. 385, 582 A.2d 1256 (1990) (quoting J. Murphy, *Maryland Evidence Handbook*, § 509, p. 160 (1989)).

In *Miller*, 159 Md.App. at 219–20, 858 A.2d 1025, the same witnesses, Jenkins and Howe, were called to testify by Miller to establish that CSX had notice of possible problems posed by the use of large ballast. We concluded that the testimony of both Jenkins and Howe was relevant, stating:

To establish some negligence in that regard on the part of CSX, Miller had to show foreseeability, to wit, that CSX was on notice that the use of large ballast was creating a footing problem for employees in the railroad yards.

The testimony of both Jenkins and Howe, particularly in their capacities as union representatives passing along workers' complaints to management, bore directly on that issue of foreseeability or notice. In the words of Rule 5–401, the testimony unquestionably had a "tendency to make the existence of" notice "more probable than it would be without the" testimony. The challenged evidence was relevant, by definition.

*Id.* In *Miller*, 159 Md.App. at 213, 858 A.2d 1025, CSX argued that the trial court erred in excluding Jenkins and Howe's testimony as the danger of unfair prejudice outweighed the testimony's probative value. After culling through the "950–page record extract," we ultimately concluded that CSX had not preserved an argument as to unfair prejudice for appellate review. *Id.* at 213, 215, 858 A.2d 1025. We determined that the argument as to unfair prejudice was not preserved as CSX had not made an objection "at any time on the basis of Rule 5–403 and the idea that relevance was outweighed by unfair prejudice." *Id.* at 214, 858 A.2d 1025. Given that the testimony of both Jenkins and Howe was relevant, however, it was admissible. *Id.* at 219–20, 858 A.2d 1025.

### Preservation

Preliminarily, in this case, we will address the preservation of appellate review as to the circuit court's denial of the request to exclude Jenkins and Howe as witnesses, Jenkins's testimony regarding Plaintiff's Exhibit Number 89, and the admission of Plaintiff's Exhibits Numbers 90, 93, and 94. At trial, prior to the testimony of Jenkins and Howe, appellant objected and the following exchange occurred:

[APPELLANT'S COUNSEL]: Yes, Your Honor. Both [Jenkins and Howe] are offered to introduce evidence of prior complaints by each of these individuals to CSX . . . . because Dr. Andres has already testified to the letters that

were written by Mr. Jenkins and Mr. Howe and those are the complaints .... any testimony with regard to the letters or the conditions that are the basis of those letters, conditions which aren't being challenged are cumulative.

On the whole, the testimony of Mr. Jenkins and Mr. Howe, we would also suggest is more prejudicial than probative.

\* \* \*

The question now is do we do anything with additional testimony other than let in prejudicial, you know, prejudicial evidence when the probative evidence under Miller has already come in.

So, on that basis, because it's cumulative because it's probative value is outweighed by it's prejudice and because the evidence that it seeks to admit has already been admitted, I would suggest that both of these witnesses should be excluded.

THE COURT: [Appellee], I'll hear from you.

[APPELLEE'S COUNSEL]: Let me take first things first. It's my understanding that the [letters] were marked for identification at the time they were displayed to Dr. Andres and did not—have not been moved into evidence at this point in time.... I do believe that it's important that [Jenkins and Howe] testify, because I think it's important that we prove for part of the civility of our case that they had actual knowledge.

Not only could they foresee, but they had actual knowledge of a problem and it was a systemic problem that they had. I think the testimony of these two gentlemen will verify that.

\* \* \*

THE COURT: [The letters] have no [t] been introduced per [se] under the way we operate and we should take it as it's coming in....

\* \* \*

[APPELLANT'S COUNSEL]: ... The question is has it A, become overly cumulative and if it is overly cumulative hasn't that probative value of notice which isn't being challenged really been vastly outweighed by the prejudicial effect of additional testimony about conditions in yards other than Baltimore? That's all I can say.

THE COURT: ... So, the fact that it may be discussing as to from another State, doesn't change the discussion, itself as a faraway place per [se]. The—it is reasonable for the objection to be made and the Court's review of it is based on whether or not A, it's cumulative and B, in light of the suggestion that it's prejudice outweighs the probative value.

The Court takes the reference by the prior witness Andres as to that which he took in consideration for his opinion.

The issue here being that as to notice, the Court will use that while it may be partially duplicative in part, the Court does not believe that it is so prejudicial that it outweighs the probative value for this trier of fact to be aware of the actual notice of the conditions as received.

It is noted however as to both and overruled at this time.

\* \* \*

[APPELLANT'S COUNSEL]: The Defense therefore, if it's alright with the Court would feel that it doesn't need to object and intercede when those questions are asked.

THE COURT: No, I still think you want to make your objection.

[APPELLANT'S COUNSEL]: Very well. Thank you.

THE COURT: If I were you would make my objection if you saw something that needed to be objected to.

[APPELLANT'S COUNSEL]: Unless the Court were inclined to grant a continuing objection we would do that.

THE COURT: I will try to be consistent.... You may want to make an objection. Okay.

After appellant's objection was overruled, a videotape recording of Jenkins's deposition was played for the jury. The

record reflects that appellant did not make any objections, during the deposition or in-court, to questions concerning its willingness to correct problems with large ballast or to provide injury reports. During cross-examination of Jenkins at deposition, the following exchange occurred regarding a letter dated May 18, 1984, written by Jenkins,[11] in which he requested that appellant use small ballast in Jacksonville terminals:

[APPELLANT'S COUNSEL]: So you drafted this letter; is that correct?

[JENKINS]: Correct.

[APPELLANT'S COUNSEL]: And as a result of this letter, you have testified that the—the railroad, the management of the railroad came in and laid small ballast over the larger ballast; is that correct?

[JENKINS]: Later. They came in and—just on the switching leads, not down the individual tracks which you had to walk also.

[APPELLANT'S COUNSEL]: But that was what you had asked for, though, for the small ballast to be placed over the large ballast.

[JENKINS]: Because I knew that they were not going to spend the money—that—that the local management could not get the money for the railroad to, what I would call, do it right and just lay, what I would call, yard ballast through the—walking ballast through the yards. I knew they wasn't going to do that. So that's the reason I asked for—

The following exchange occurred, during cross-examination at the deposition, as to Jenkins's discussions with management about obtaining reports on injuries:

[APPELLANT'S COUNSEL]: Do you have the[ incident and] injury reports?

[JENKINS]: Ma'am, they—they would not give me that report.

[APPELLANT'S COUNSEL]: Did you ask for them?

---

11. The May 18, 1984 letter was marked for identification as Plaintiff's Exhibit Number 89.

[JENKINS]: I could ask, but they would say no.

At trial, Howe testified regarding complaints to appellant regarding the use of large ballast and a letter dated August 21, 1992, in which he advised appellant of the complaints. During direct examination of Howe, the following exchange occurred:

[APPELLEE'S COUNSEL]: Could you tell the juror what those complaints [received from railroad employees] were about?

[HOWE]: The big ballast that was put into the yard.

[APPELLEE'S COUNSEL]: What was the complaints about the big ballast?

[HOWE]: It was unlevel to walk in and it was hard to walk on. It would move under your feet. It was causing a slip, trip, fall haz[ ]ard and it hurt your feet and legs.

[APPELLEE'S COUNSEL]: Did you bring this to the attention of your supervisors?

[HOWE]: Yes, I did.

[APPELLEE'S COUNSEL]: Was this brought to your supervisor's attention orally or in writing, initially?

[HOWE]: Initially, it was orally.

[APPELLEE'S COUNSEL]: Did you get any relief?

[HOWE]: No, sir.

[APPELLEE'S COUNSEL]: Did [t]here come a time when you put in writing your complaint—

[HOWE]: Yes, sir.

[APPELLEE'S COUNSEL]:—to your supervisor?

Appellant objected to the admission of the letter, but the circuit court overruled the objection and admitted the August 21, 1992, letter into evidence as Plaintiff's Exhibit Number 90. The following exchange occurred:

[APPELLEE'S COUNSEL]: Your Honor, I would move the introduction of Plaintiff's Exhibit Number 90.

THE COURT: So admitted without objection.

[APPELLANT'S COUNSEL]: Subject only to the previous, Your Honor, objection.

THE COURT: Subject to?

[APPELLANT'S COUNSEL]: Subject only to the objections that Your Honor has ruled upon.

THE COURT: So there is an objection. It's overruled.

[APPELLANT'S COUNSEL]: All right.

THE COURT: So admitted.

During Howe's testimony, two additional letters were admitted into evidence with no objection from appellant, as Plaintiff's Exhibits Number 93, a letter by Butch Watson [12] dated July 20, 1995, and Number 94, a follow up letter written by Howe to appellant "[b]ecause [appellant] w[as]n't getting anything done." [13] Howe read portions of Plaintiff's Exhibit Number 93 aloud to the jury, including the following: "We must address the issue of the big ballast in the yard B area, especially the area of the tremor crossovers and the departure ladder. We have talked about this a number of times and still no solution." After Exhibit Number 93 was admitted into evidence, the following exchange occurred:

[APPELLEE'S COUNSEL]: Did this continue to be a problem?

[HOWE]: Yes, it did.

[APPELLEE'S COUNSEL]: Did you have to write to Mr. Watson again?

[HOWE]: Yes, I did.

After Exhibit Number 94 was admitted, the following exchange occurred:

---

12. Watson, who was the Terminal Superintendent at the Hamlet Terminal, made efforts to assist Howe in obtaining relief as to the ballast issue. Appellant did not object to the admission of Plaintiff's Exhibits Numbers 90, 93 or 94 on the basis that the letters contained hearsay information.

13. Plaintiff's Exhibit Number 94 does not contain a date and Howe did not testify as to the date the letter was written, although the letter indicates it was written after Howe's letter dated August 1992.

[APPELLEE'S COUNSEL]: Did it continue to be a problem after '95?

[HOWE]: Yes, it did.

Appellant did not object to Howe's testimony regarding Exhibits Number 93 and Number 94.

 We conclude that appellant has preserved issues only as to Plaintiff's Exhibit Number 90 and as to the ruling of the circuit court permitting Jenkins and Howe to testify. As to Plaintiff's Exhibits Number 93 and Number 94, Watson's letter dated July 20, 1995, and Howe's follow-up letter, appellant did not object to admission of either letter or Howe's testimony that appellant failed to respond to complaints within the letters. Appellant was on notice that the trial judge had not granted a continuing objection as to either the letters or to the testimony of Jenkins or Howe. When appellant requested a continuing objection, the trial judge responded: "No, I still think you want to make your objection[,]" and "I will try to be consistent . . . You may want to make an objection. Okay." It is clear the court denied the request for a continuing objection. By failing to object to the admission of Exhibits Number 93 and Number 94 and testimony regarding appellant's lack of response to the letters, appellant has not preserved an issue as to the matters for review.

 Similarly, appellant failed to object to Jenkins's testimony during deposition that he knew appellant would not respond to issues raised in his letter of May 18, 1984—Plaintiff's Exhibit Number 89—or provide injury reports. Appellant elicited the testimony during cross-examination and did not object to any response from the witness. As such, no issue relative to Jenkins's deposition testimony is preserved. *See* Maryland Rule 2–416(g) ("Objections to all or part of the deposition shall be made in writing within sufficient time to allow for rulings on them and for editing of the tape before the trial or hearing."); Maryland Rule 2–517(a) ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is

waived...."); *Billman v. State Deposit Ins. Fund Corp.*, 88 Md.App. 79, 114, 593 A.2d 684, *cert. denied*, 325 Md. 94, 599 A.2d 447 (1991) ("Denial of a motion in limine, without more, does not preserve for appellate review the propriety of later admitting specific evidence which falls within the scope of the issue raised by the motion. If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review." (citation and quotations omitted)). Thus, by failing to object, appellant has not preserved an issue for review as to the admission of Plaintiff's Exhibits Number 93 and Number 94, testimony regarding appellant's lack of response to the letters, or Jenkins's deposition testimony regarding Plaintiff's Exhibit Number 89.

## Merits

■ Upon review of the foregoing exchanges, we conclude, however, that appellant has preserved the issue of unfair prejudice as to testimony regarding Plaintiff's Exhibit Number 90, the letter of August 21, 1992, and the circuit court's denial of appellant's request to exclude Jenkins and Howe as witnesses.[14] Nonetheless, we discern no abuse of discretion by the circuit court in admitting Plaintiff's Exhibit Number 90, or permitting Jenkins and Howe to testify. As to admission of Jenkins and Howe's testimony generally, the record reflects that the circuit court considered appellant's objection, weighed the probative value of the anticipated testimony against the danger of unfair prejudice and cumulativeness, and concluded that although somewhat cumulative, the testimony of Jenkins and Howe was relevant as to the issue of actual notice and was not substantially outweighed by the danger of unfair prejudice. As to admission of Exhibit Number 90, the record reflects that appellant simply objected on the same basis it

---

14. In its brief, appellant argues that neither Jenkins nor Howe was qualified as an expert. A review of the record reflects that appellant did not argue the matter before the circuit court. We, therefore, need not address the contention.

had earlier provided regarding admission of Jenkins and Howe's testimony generally—that admission of the letter was cumulative and prejudicial.

 In objecting, appellant failed to provide any basis for the theory that the prejudicial effect of Jenkins's and Howe's testimony rose to a level of "unfair prejudice." [15] In describing the alleged prejudice, appellant's counsel argued as follows, ". . . the prejudicial effect of additional testimony about conditions in yards other than Baltimore[.] That's all I can say." As we stated in *Miller*, 159 Md.App. at 220, 858 A.2d 1025, "[t]he challenged evidence was relevant, by definition." In the absence of an argument articulating how the danger of unfair prejudice substantially outweighed the probative value of the testimony, the circuit court properly overruled appellant's objection.

 Appellant's contention that the testimony of Jenkins and Howe was cumulative of Dr. Andres's testimony is not substantiated by the record. Dr. Andres, an expert in the area of ergonomics [16] and bio-mechanics, testified as to how he conducts an assessment, or investigation, of a company's ergonomic problem. Dr. Andres testified that he reviews employee complaints to determine whether there is a pattern that could explain the cause of injuries to employees. When asked

---

**15.** We perceive no merit in appellant's contention that the circuit court erred in admission of Jenkins's and Howe's testimony because it painted appellant in a "bad light." "Evidence is never excluded merely because it is 'prejudicial' " or portrays a party in a negative fashion. *Moore*, 84 Md.App. at 172, 578 A.2d 304. There must be an additional showing that the prejudice rises to the level of "unfair" by evoking such a strong emotional response—sympathy, hatred, or contempt to name a few—in the trier of fact that logic and reasoning cannot overcome the prejudice. *Id.; Blaw–Knox*, 88 Md.App. at 662, 596 A.2d 679. In this case, there was no such showing and the circuit court properly overruled the objection.

**16.** Dr. Andres testified that an ergonomist, or one who studies ergonomics, "is a scientist who focuses on the work place and [looks] at [ ] what humans are capable of doing and [tries] to fit the jobs to what they're capable of doing. So, we study jobs and we study humans and we try to fit the jobs to the humans."

if he was able to locate any data that assisted him in his investigation, Dr. Andres testified: "As far as complaint[s] and different documentation internally of problems, yes, I have been provided with those." Thereafter, Dr. Andres read aloud portions of Jenkins's and Howe's letters, as well as other letters, as "example[s] of [ ] letter[s] that [ ] complain[ ] about large rock." As to Plaintiff's Exhibit Number 90, Dr. Andres read the following portions aloud to the jury:

[DR. ANDRES]: It says, "Dear Mr. Watson, the following unsafe conditions have been recently reported to me. I would appreciate your immediate attention to these conditions in order that the employees will have a safer place to work."

Item one has to do with drainage. Item two, "I have received numerous complaints on the large ballast which has been placed in the yard sometime back and has never been corrected."

"At one time, some smaller ballast was placed on the switching lead at the south end of the departure yard. The larger ballast has now worked it's way to the top with the smaller ballast being worked under the larger ballast."

"I have received complaints that there is the same problem with this large ballast at the south end of the receiving yard." There are other items discussed [in the letter] as well.

Dr. Andres did not read the entirety of Plaintiff's Exhibit Number 90 aloud to the jury, and the jury was not made aware of the full contents of the letter until the letter itself was admitted into evidence during Howe's testimony. Appellant did not object when Dr. Andres read aloud portions of the letter.

In contrast, the testimony of Jenkins and Howe, as fact witnesses, addressed rail yard conditions that existed at the time the letters were written. As to Plaintiff's Exhibit Number 90, Howe testified about the rail yard conditions and employee complaints that he received which led him to write to appellant to notify it of the problems the employees were

experiencing and to request appropriate relief. We conclude that the circuit court did not abuse its discretion in overruling appellant's objections to admission of the testimony of Jenkins and Howe or Plaintiff's Exhibit Number 90, as the evidence was relevant and neither substantially outweighed by the danger of unfair prejudice nor cumulative.

## III.

 Appellant contends that the circuit court abused its discretion by preventing appellant from cross-examining appellee's economics expert witness, Dr. Hamilton, as to the average age of retirement for railroad employees and the American Association of Railroads' (AAR) work-life expectancy table for railroad employees. Appellant maintains that cross-examination of Dr. Hamilton would have revealed that most railroad employees retire at age sixty, in contradiction of appellee's testimony that he would retire at age sixty-seven or sixty-eight. Appellant contends that had cross-examination of Dr. Hamilton been permitted, the jury might have determined that appellee "would have *no* future lost income because he was not expected to become disabled until age 63 or 64, years after most railroad employees retire." Relying on *Bickerstaff,* 187 Md.App. at 244, 978 A.2d 760, appellant argues that admissibility of statistical evidence as to a railroad employee's average age of retirement fell within the court's discretion, and that the circuit court abused its discretion by not permitting cross-examination of Dr. Hamilton.

Appellee responds that the circuit court did not abuse its discretion in precluding cross-examination of the expert as to statistics on a railroad employee's average retirement age and that the expert was cross-examined in areas that addressed the same subject matter. Appellee points out that during cross-examination, Dr. Hamilton was asked to calculate appellee's economic losses if he retired at age sixty rather than age sixty-eight, and appellant "was able to cross-examine Dr. Hamilton on the reliability of his assumption that [appellee] would retire" at "age 67 as opposed to 60." Relying on *Tiller,* 179 Md.App. 318, 944 A.2d 1272, appellee maintains the circuit

court properly precluded questions regarding the statistics because "questions regarding the AAR statistics were 'the same' as, and would lead to, testimony about an employee's eligibility for retirement benefits, a path that the *Tiller* court made clear is not permitted." Appellee contends that no prejudice resulted from the limitation of the cross-examination because the jury was informed multiple times throughout the course of the trial that appellee "might otherwise have retired at 60."

In *Tiller*, 179 Md.App. at 329, 339–40, 944 A.2d 1272, we held that evidence of an employee's expected retirement age was not an exception to the collateral source rule, which provides that evidence of benefits from a collateral source— for example, sick benefits or pension benefits—is not admissible to diminish a plaintiff's damages. In *Tiller*, 179 Md.App. at 340, 944 A.2d 1272, we concluded:

> [E]vidence of future retirement or pension benefits is not admissible on the issue of when an employee, but for the accident, would have been expected to stop working. The probative value is too attenuated to offset the potential misuse that the jury could make of the evidence. Evidence bearing on the expected work-life of the employee is not a cognizable exception to the collateral source rule.

In *Bickerstaff*, 187 Md.App. at 244, 978 A.2d 760, we held that the trial court did not abuse its discretion "in excluding appellant's cross examination question regarding industry retirement age statistics." In *Bickerstaff*, CSX (appellant) attempted to cross-examine Dr. Hamilton (the same witness as in this case) about statistics showing that the standard retirement age in the railroad industry was age sixty. 187 Md.App. at 241–42, 244, 978 A.2d 760. CSX did not attempt to introduce the statistical information into evidence during cross-examination. *Id.* at 243, 978 A.2d 760. Holding that the trial court in *Bickerstaff* did not abuse its discretion in not permitting the cross-examination, we explained:

> We stated in *Tiller* that evidence of one's eligibility to receive retirement benefits at age 60 is relevant and materi-

al. The question posed to Dr. Hamilton, however, did not bear on the appellees' eligibility to receive retirement benefits at age 60. Instead, appellant sought to question Dr. Hamilton, not with evidence but with purported statistical information that "the overwhelming majority of people that retire in the railroad industry were, in fact, 60 years old." Given that the question posed did not relate to appellees individually, the determination as to the relevance of Dr. Hamilton's answer fell within the trial judge's discretion. *Bickerstaff*, 187 Md.App. at 244, 978 A.2d 760. We observed that throughout the trial, the jury was "repeatedly reminded that [the railroad employees] were eligible to retire at age 60." *Id.*

In this case, during cross-examination of Dr. Hamilton, the following occurred:

[APPELLANT'S COUNSEL]: You do know that the American Association of Railroads publishes a work life expectancy table for employees, don't you?

[DR. HAMILTON]: Yes.

[APPELLEE'S COUNSEL]: Objection, Your Honor.

THE COURT: Approach.

(Whereupon, Counsel approached the bench and the following ensued:)

THE COURT: Yes, sir?

[APPELLEE'S COUNSEL]: Your Honor, this is getting exactly into what *Tiller* says not to get into.

\*　　\*　　\*

THE COURT: ... Specifically I am concerned that we're getting into an area that clearly *Bickerstaff* is saying don't go to.

Now, now that I've said that, be cautious that you've gone too far, in my mind. You can touch but you have to move on.

\*　　\*　　\*

[APPELLANT'S COUNSEL]: [A]re you telling me that I can't ask [Dr. Hamilton] about the AAR work life tables?

THE COURT: You can touch, but you're going to have to move on[.]

[APPELLANT'S COUNSEL]: These tables don't have anything to do with retirement benefits. This is straight work life stuff.

THE COURT: No. That isn't what I'm doing because it is the same, in my humble opinion, it is the same. Are you aware that railroad employees generally don't retire until age such an[d] such or do retire at age such and such.

Using the table to substitute for our question as to the assumption that he should be retiring at age 60, when he's now saying he has an intention to—you can argue but even though he says that he's going to retire at 67, that is unlikely based on information received from him that he would work that long.

\* \* \*

THE COURT: ... What you want to argue, in a circular fashion, is that the evidence is likely that he will retire younger based on something else.

\* \* \*

THE COURT: ... The wisdom of Judge [Moylan] in both of his opinions connecting that which is in *Miller* to *Tiller* and that which was—

(Open court.)

THE COURT: Quiet please.

(Bench conference).

THE COURT: As to Judge Woodward's writing in *Bickerstaff.* It is that—I can't let you do that, under FELA's interpretation, which liberally applies to the employee. I have to say that. I did allow you to touch and move on.

As cross-examination continued, appellant asked the following questions:

[APPELLANT'S COUNSEL]: If we use a different retirement age, would that change your calculations?

[DR. HAMILTON]: Yes.

\* \* \*

[APPELLANT'S COUNSEL]: And we're relying upon age 60, as is indicated in that letter, be consistent with any statistical analysis of which you're aware?

\* \* \*

THE COURT: The Court is reversing and allowing the answer to the last question, which is yes.

\* \* \*

[APPELLANT'S COUNSEL]: If you assume that [appellee] would have retired at age 60, what would his economic loss be?

[DR. HAMILTON]: Zero.

Upon review of the record, we have no difficulty in concluding that the circuit court did not abuse its discretion by preventing cross-examination of Dr. Hamilton as to the railroad employee's average age of retirement. Permitting or preventing cross-examination as to the average industry retirement age was within the sound discretion of the trial court. *Bickerstaff*, 187 Md.App. at 244, 978 A.2d 760. As in *Bickerstaff*, 187 Md.App. at 243, 978 A.2d 760, appellant, in this case, attempted to cross-examine Dr. Hamilton about general statistics without introducing the work-life expectancy table into evidence. In *Bickerstaff*, 187 Md.App. at 241–42, 978 A.2d 760, CSX asked Dr. Hamilton: "Are you aware that the statistics from the railroad retirement board show that just last year, the overwhelming majority of people that retire in the railroad industry were, in fact, 60 years old?" In this case, appellant asked Dr. Hamilton: "You do know that the American Association of Railroads publishes a work life expectancy table for employees, don't you?" and "And we're relying upon age 60, as is indicated in that letter, be consistent with any statistical analysis of which you're aware?" Appellant did not question Dr. Hamilton as to facts already in evidence, but rather attempted to cross-examine Dr. Hamilton as to "statistical information" that did not relate to appellee "individually."

Examination of the circuit court's ruling in this case is *Bickerstaff* redux. We see no abuse of discretion in the circuit court's limitation of cross-examination of the expert.

## IV.

Appellant contends that the jury instructions given by the circuit court on the background and purpose of FELA and the violation of a statute as evidence of negligence were not generated by the evidence and "served no purpose but to prejudice the jury against [appellant]." Appellant complains of the following language in the instruction: "For your own understanding, if you would please, is that [FELA] was, in fact, enacted back in 1908" and "The reason, if you will, is not as much of a debate in this case, but it was in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results thereof." Appellant contends that the instruction on the background and purpose of FELA was prejudicial because it informed the jury that railroad work is inherently dangerous and has harsh consequences for employees, and implied that the jury was required to tip the scales in favor of appellee. Appellant argues that the circuit court erred in giving the instruction regarding the violation of a statute as evidence of negligence and the error was prejudicial because there was no allegation that appellant violated a statute.

Appellee responds that the circuit court did not abuse its discretion by giving an instruction on the policy considerations underlying FELA as the court instructed the jury that such policy considerations were not at issue in the case, and Maryland appellate courts have held that instructing a jury on the policy underlying a statute is not error. Appellee argues that the instruction contained no facts indicating that railroad work is dangerous or that the jury was required to rule in favor of appellee to balance the scales of justice. Appellee contends that the instruction was "extremely brief" and "immediately followed by accurate statements of the legal standards under the FELA."

Appellee argues that the instruction regarding violation of a statute as evidence of negligence did not prejudice appellant and was harmless. Appellee concedes that appellant was not alleged to have violated a statute, but contends that appellant failed to prove any prejudice from the instruction. Appellee argues that the jury was not advised of a specific statute that might have been violated, and no such statute was read to the jury.

 When reviewing jury instructions, we give the trial court "wide discretion as to the form ... and, absent a clear abuse of that discretion, an instruction will not be reversed on appeal." *Blaw–Knox Construction Equipment Co. v. Morris,* 88 Md.App. 655, 666–67, 596 A.2d 679 (1991). "Moreover, when an objection is raised as to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *Id.* at 667, 596 A.2d 679 (citation and quotations omitted). Upon appellate review, we will not "condemn a charge because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other." *Nora Cloney & Co. v. Pistorio,* 251 Md. 511, 515, 248 A.2d 94 (1968). Even in cases where error is found, "[i]t has long been the policy in this State that [the court] will not reverse a lower court judgment if the error is harmless." *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). On appeal,

> a party challenging an erroneous jury instruction in a civil case must demonstrate to the court why the error was prejudicial. An erroneous instruction may be prejudicial if it is misleading or distracting for the jury, and permits the jury members to speculate about inapplicable legal principles. An error may also be prejudicial if the error, by itself, could have precluded a finding of liability where one was warranted .... in certain cases, the mere inability of a reviewing court to rule out prejudice, given the facts of the case, may be enough to declare an error reversible. The reviewing court, in considering these issues, should engage in a comprehensive review of the record, and base its

determination on the nature of the instructions and its relation to the issues in the case.

*Barksdale,* 419 Md. at 669–70 (citations omitted). As to prejudice, the complaining party must show "more than that prejudice was *possible*," but "that it was probable." *Id.* at 662, 20 A.3d 765. In situations where prejudice is "not readily apparent," the Court of Appeals instructs that a "reviewing court must focus on the context and magnitude of the error." *Id.* at 665, 20 A.3d 765.

 In this case, upon review of the circuit court's instructions as a whole, we are not persuaded that the circuit court abused its discretion in instructing the jury on the background and purpose of FELA. The record reflects that the circuit court instructed the jury as to the overall nature of a FELA case, and in doing so, stated FELA was created "in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results thereof." The circuit court instructed the jury as follows: "[FELA] impose[s] on the Defendant railroad a duty to [its] employees and to all of [its] employee including [appellee] to exercise reasonable care to provide the employee with a reasonably safe place in which to work, reasonably safe conditions to work and reasonably safe tools and equipment." The circuit court specifically instructed the jury that the background and purpose of FELA was "not as much of a debate in this case," and immediately instructed as to the duties the railroad employers owe to employees under the Act. Upon reviewing the instruction as a whole, we perceive no basis for appellant's contention that the limited language complained of—that the statute was created in recognition of the dangers involved in railroad work and to alleviate the harsh results imposed by the results—gave rise to an implication that the jury was required to rule in favor of appellee.

 We turn to the circuit court's instruction on the violation of a statute as evidence of negligence. The court's instruction on the violation of a statute as evidence of negligence was given immediately following an instruction on disregarding taxes in determining the amount of damages and

immediately before an instruction on awarding damages to accurately compensate appellee. Appellant noted an exception to the instruction stating "there's no evidence of a violation of any statute in this case." Appellee responded:

> This is the second point. We had requested an instruction instead of addressing the question of negligence and they would consider the evidence which was presented concerning the custom standard in the industry or safety rules. If you find that there was such custom standards or rules they may indicate recreational haz[ ]ards. So, basically you gave the instruction with respect to the violation of statute, however we believe that there's evidence here in violations of [appellant's] own rules and industry standards with respect to the ballast and we believe the jury can consider that as evidence of negligence as well.

It is undisputed that violation of a statute as evidence of negligence was not an issue in the case, *i.e.* both parties agree that appellant was not alleged to have violated a statute. It appears that appellee's intent was to have the jury instructed as to violations of appellant's internal rules and industry standards as evidence of negligence, but this did not occur. We conclude that the circuit court's instruction on the violation of a statute as evidence of negligence was error.

⬛⬛⬛ That conclusion does not end the analysis. To establish that the erroneous jury instruction warrants reversal, appellant bears the burden of demonstrating prejudice. *Barksdale*, 419 Md. at 669, 20 A.3d 765. In this case, despite appellant's contentions, we conclude the jury instruction was harmless. We are guided by cases in which we have previously determined that the standard of review in FELA cases is an employee-friendly standard. Any close calls or ties should be awarded to the employee's benefit. *Miller*, 159 Md.App. at 145, 858 A.2d 1025. Here, as appellee points out, the jury was not advised of a specific statute alleged to have been violated by appellant. No specific statute alleged to have been violated was read aloud to the jury.[17] There was no argument or

---

17. Appellee wrongfully relies on *Barksdale* to support the proposition that reversal is warranted due to the erroneous instruction. This case

reference to the erroneous instruction by either party in closing argument. There were no questions from the jury as to the erroneous instruction [18] or any indication that the jury focused on the erroneous instruction. Other than the instruction being given, the record is devoid of any basis to support appellant's contention of prejudice. Absent evidence of any prejudice, confusion, or even a question by the jury as to the instruction, we conclude that the jury instruction as to violation of a statute as evidence of negligence was harmless.

## V.

Appellant contends that the damages awarded to appellee are excessive. Appellant asserts that there was no evidentiary basis for an economic damages award of $444,000 and that the maximum economic damages amount alleged at trial was $293,790.[19] Appellant contends that this Court "should order

---

is obviously distinguishable from *Barksdale.* In *Barksdale,* 419 Md. at 654–55, 670, 20 A.3d 765, the jury was informed that a violation of Section 902A of the Baltimore City Code, which mandated that occupants of dwellings keep dwellings in a clean and sanitary condition, was evidence of negligence. The trial court read the statute aloud to the jury when giving instructions. *Id.* at 670, 20 A.3d 765. Perhaps the most important distinction, though, is the nature of the case itself. *Barksdale* concerned a common law negligence claim, involving injuries sustained from lead paint, and this is a FELA case. *Id.* at 651, 20 A.3d 765. FELA cases involve a different standard of review than common law negligence cases. *Miller,* 159 Md.App. at 145, 858 A.2d 1025. As we stated in *Miller,* "it is not hard to figure out who wins the ties and who gets the benefit of the close calls[,]" and the circumstances of this matter do not present a close call. 159 Md.App. at 145, 858 A.2d 1025.

**18.** The record reflects that the jury asked only one question during the course of its deliberations: "Is there a specific way we calculate non-economic damages?" The single insight into the jury's mindset reveals that the jury was concerned with appropriately calculating non-economic damages rather than with liability or the significance of the instruction regarding the violation of a statute.

**19.** According to appellant, appellee alleged the following economic damages at trial:

[Appellee's] economist testified that, if [appellee] has to retire at age 64 and, but for his injuries, would have worked until age 67, his economic loss would be $162,200. That figure would increase by

a new trial unless [appellee] agrees to remit the $150,210 surplusage." Appellant contends that the award of $1,335,000 for non-economic damages was grossly excessive as appellee presented only "modest evidence of pain and emotional distress" about a condition, osteoarthritis, that "most people associate with simply growing older." Appellant argues that, in light of other cases, the non-economic damages award is excessive and should be remitted to no more than $302,600.[20]

Preliminarily, appellee contends that by not previously requesting a reduction of the damages to the amount now argued, appellant has waived the right to request remittitur. Appellee argues that, even if preserved, the circuit court did not err in denying appellant's motion for a new trial and/or remittitur because the amount awarded by the jury was commensurate with his economic losses and pain and suffering. Appellee argues that the $444,000 awarded in economic damages was an extrapolation of figures and information regarding his loss presented to the jury during the course of the trial.[21]

---

$70,000 if [appellee] has to retire in four years, and by $61,590 if he would have worked until age 68.

20. Appellant contends that based on the circuit court's instruction that appellee's life expectancy was 22.1 years, the non-economic damages equate to roughly $60,000 per year for the rest of appellee's life. Appellant argues that other cases, namely *Mazyck v. Long Island R.R. Co.*, 896 F.Supp. 1330 (E.D.N.Y.1995), demonstrate a different result is appropriate—damages reduced to only $13,692.28 per year for a total of $302,600.

21. Appellee contends the following:

The jury's award of $444,000 in economic damages does not reflect speculation, but rather an extrapolation. [Appellee's] expert economist testified that if [appellee] had to retire five years from the date of trial, at age 64 and, but for his injuries, he would have otherwise not retired until 67, his economic loss would have been $162,200. The expert testimony also reflected that if those dates changed slightly, and [appellee] had to retire in four years, at age 63, and would have otherwise not retired until age 68, his economic loss would have increased by $131,590, to $293,790.

Using the expert testimony as a guideposts, if jurors believed, as the evidence suggested, that [appellee] would have had to retire even earlier, at age 61 or 62 and otherwise would have retired even later,

Appellee argues that the non-economic damages awarded—$1,335,000 (reduced to $934,500 once adjusted for apportionment)—are not excessive. Appellee contends that the non-economic damages award is not excessive given the awards in other FELA cases—*Bickerstaff* and *Miller*—and given the evidence presented at trial demonstrating that appellee "is in a state of decline, has stopped doing the activities he once enjoyed, and will soon be unable even to work."

██ "The trial practice of granting a new trial sought by the defendant, unless the plaintiff remit[s] a portion of the verdict which the trial court deems excessive, is well established in Maryland." *Turner v. Washington Suburban Sanitary Comm'n,* 221 Md. 494, 501–02, 158 A.2d 125 (1960). In making this decision, the following applies:

> The standard to be applied by a trial judge in determining whether a new trial should be granted on the ground of excessiveness of the verdict has been variously stated as whether the verdict is "grossly excessive," or "shocks the conscience of the court," or is "inordinate" or "outrageously excessive," or even simply "excessive."

*Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988) (citations omitted). We have held that "the trial court has broad discretion to determine whether a jury's damages award is so excessive that it warrants a new trial, and to give the plaintiff the alternative option of accepting a remittitur." *Hebron Volunteer Fire Dep't, Inc. v. Whitelock,* 166 Md.App. 619, 628, 890 A.2d 899 (2006) (citation omitted).

██ Absent an abuse of discretion, a trial judge's remittitur decision will remain as decided by that judge. *Owens–Illinois, Inc. v. Hunter,* 162 Md.App. 385, 415, 875 A.2d 157,

---

at age 69 or 70, jurors could have easily extrapolated the expert testimony to infer that his economic losses were greater and conclude that approximately another $150,000 should be added to the economic award. The expert testimony reflected that when retirement was one year earlier and expected retirement was one year later, $131,590 should be added to the economic award.

Concluding that [appellee] would retire at 61 or 62 and would have otherwise not retired until 69 or 70 is firmly rooted in the evidence.

*cert. denied,* 388 Md. 674, 882 A.2d 287 (2005). "Rather, for us to conclude that the circuit court has abused its discretion, the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Whitelock,* 166 Md.App. at 629, 890 A.2d 899 (citation and quotations omitted).[22]

In *Miller,* 159 Md.App. at 134, 858 A.2d 1025, we noted that "courts look with favor on FELA suits and the rewards for a successful plaintiff are invariably higher than would be the case with a workers' compensation award." Although the damages award was not at issue in *Miller,* we noted that the "jury award to the plaintiff was for $1,500,000.00. Not many workers' compensation awards would ever reach that figure for an osteoarthritic left knee." *Id.* at 135, 858 A.2d 1025. In *Bickerstaff,* 187 Md.App. at 205–06, 978 A.2d 760, we did not reach the issue of whether or not the jury's verdict was excessive because we vacated and remanded on other grounds, but in that case, the jury awarded each plaintiff an unadjusted total of between $750,000 and $6,000,000.

 In this case, the circuit court properly exercised its discretion in denying appellant's motion for a new trial and/or remittitur on the ground that the jury's verdict as to economic and non-economic damages was not excessive. Viewing the evidence in the light most favorable to appellee,

---

**22.** In *Whitelock,* 166 Md.App. at 630, 890 A.2d 899, we held that the trial court did not abuse its discretion in granting the defendant's motion for a new trial as to damages and giving Whitelock the option of accepting a remittitur. In *Whitelock*—a common law negligence action—the trial court considered evidence that as a result of the defendant's negligence, Whitelock had "undergone several medical procedures and hours of physical therapy, and that he had experienced three years of pain and discomfort," and was limited as to the activities in which he could participate. *Id.* at 627, 629, 890 A.2d 899. The trial court had evidence before it that Whitelock's "long-term disabilities d[id] not prevent him from driving and carrying on a small business." *Id.* at 629, 890 A.2d 899. Based on this evidence, the trial court granted the motion for a new trial or remittitur, finding that the non-economic damages award of $525,000 was excessive, but that $300,000 was not. *Id.* at 627, 629–30, 890 A.2d 899.

the testimony in the case reveals that appellee first began experiencing difficulties with his knees in 2003 or 2004. Appellee eventually underwent arthroscopic surgery on both knees in January 2008. By that time, appellee had developed osteoarthritis in both knees and the knees had torn muscles and cartilage "floating around" as well as a general worn down "crab meat" appearance. Appellee had a recovery period of five months after surgery, which included bi-weekly physical therapy for two months.

Appellee testified that upon his return to work, his knees worsened and became painful. Following his surgery, appellee received numerous gel lubricant injections in his knees and was expected to continue to receive the injections in "two series of three injections in each knee twice a year." According to appellee's expert witnesses, appellee's knees will continue to worsen over time, and one or both of his knees will need to be replaced through knee replacement surgery at some point in the future. Appellee's doctors estimated that they would "be surprised if [appellee] was able to continue [working] successfully five years on out." In addition, appellee's activities became limited compared to prior to the injuries. Appellee was once very active and enjoyed bike riding, hunting, fishing, and playing with his young grandson. At the time of trial, it had been several years since appellee had ridden a bike or hunted. Appellee also had difficulty playing with his grandson because he could not run and play ball or participate in soccer games.[23]

---

**23.** Appellant's reliance on *Mazyck* is unconvincing. In *Mazyck*, 896 F.Supp. at 1338, the United States District Court for the Eastern District of New York held that a jury's award of $436,932.80 in damages for future pain and suffering in a FELA case was "grossly in excess" of what the evidence supported. In reaching its decision, the Court emphasized the fact that the employee was able to resume some of his past recreational activities, including playing half-court basketball on a weekly basis. *Id.* This case is clearly distinguishable—appellee testified that he has been unable to resume his past recreational activities. In addition, appellee is expected to continue receiving knee injections and undergo replacement surgery on one or both knees in the future.

The testimony of appellee's experts demonstrated that, contrary to appellant's contention, the jury could have reasonably arrived at the economic damages award amount by determining, based on all of the evidence given, that appellee would have to retire earlier than age sixty-four and would otherwise have retired later than age sixty-seven, the baseline ages which appellee's expert used in calculating damages. For example, one of appellee's doctors testified that if appellee kept working in his current job, appellee was "not going to last five years" to age sixty-four and might not even last four years to age sixty-three. The jury could also have reasonably concluded that appellee would have retired later than age sixty-seven, as appellee testified that he "hoped [he] could work until 68 maybe longer and be one of the diehards." Had the jury reached these two conclusions, appellee's economic damages would correspondingly increase above what appellant contends is the acceptable amount.

 The total unapportioned award to appellee is $1,780,000. Before this Court, appellant requests that the non-economic damages award be remitted to no more than $302,600. In the Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial, however, appellant argued that the jury could have been reasonably justified in awarding $1,113,000 in non-economic damages, not $302,600. Once apportioned, the non-economic damages award yields $934,500, which is less than what appellant requested in the post-trial motion. For all of the reasons set forth above, in our view appellant has shown no abuse of discretion in the circuit court's denial of the motion for a new trial and/or remittitur.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**